OPINION
{¶ 1} Plaintiff-appellant, the City of St. Marys ("St. Marys") appeals the judgment of the Court of Common Pleas, Auglaize County, Ohio granting summary judgment in favor of defendant-appellee, Auglaize County Board of Commissioners ("County"). The trial court determined that the City had breached a contract agreement with the County regarding the operation of the St. Marys Landfill ("Landfill"), permitting the County to stop performing its obligations under the contract. The County also cross-appeals, claiming that the trial court erred in initially granting partial summary judgment in favor of St. Marys on the issue of the length of the County's environmental monitoring obligations after the closure of the Landfill.
 {¶ 2} The dispute in this case arose from an agreement entered into between St. Marys and the County in 1988. The agreement was reached after the Ohio General Assembly passed H.B. 592, codified in R.C. Chapters 343 and 3734, under which the County was required to establish a "Solid Waste Management District" ("SWMD") to oversee the disposal of solid waste in the county, or to join in with several other counties in establishing a SWMD. Further, because the County had a population of less than 120,000 the County was required to obtain a "C-2 exemption" from the Ohio EPA in order to establish its own SWMD. In order to obtain that exemption, the County had to demonstrate that it had a "firm agreement" with a licensed landfill that had sufficient capacity to dispose of 10 years worth of county-generated solid waste.
 {¶ 3} H.B. 592 also required the Ohio EPA to adopt new standards within one year governing engineering design, construction, and operation of solid waste landfills "that incorporate the best available technology with respect to such facilities." The parties recognized that the Landfill had to meet these new "best available technology" standards to fulfill the requirements for obtaining a C — 2 exemption. Additionally, the City would need to expand the size of the Landfill in order to be able to dispose of 10 years worth of solid waste. The estimated cost of meeting this requirement was over 4.5 million dollars.
 {¶ 4} The County desired to create its own SWMD, and therefore entered into negotiations with St. Marys to dispose of county-generated solid waste at the Landfill. The parties thereafter entered into an agreement for a twelve year term. Under the agreement, St. Marys permitted the residents of Auglaize County to dispose of solid waste generated within the county at the Landfill. The city also agreed to "meet the requirements of all relevant statutes and regulations with respect to [the operation of the Landfill]," and to "accomplish such improvements to the [Landfill] as are necessary to obtain and retain the C — 2 exemption." Furthermore, St. Marys agreed to establish an initial environmental monitoring program as required by the Ohio EPA.
 {¶ 5} The County agreed to monitor the Landfill to ensure it met with all Ohio EPA rules and regulations. Specifically, the agreement provided:
[T]he County shall:
 a. As soon as the monitoring program initiated by the City* * * is approved by the [Ohio EPA], undertake completeresponsibility for all the environmental monitoring required forthe [Landfill] by applicable statutes and regulations, includingthe operation of such environmental monitoring and any capitalexpenditures necessary to accomplish the monitoring, both priorto and subsequent to closure of the site.
Additionally, the County agreed to take all steps necessary to ensure continued Ohio EPA approval of the environmental monitoring program at the Landfill.
 {¶ 6} Two additional provisions in the agreement are also relevant for purposes of this appeal. First, Paragraph 8 of the agreement provides that St. Marys will "establish a rate for the disposal of solid waste" at the Landfill, and review that rate annually. Second, Paragraph 9 of the agreement states that the parties "agree that a portion of the rate established pursuant to Paragraph 8(a), supra, shall be set aside for the creation and maintenance of a fund." That paragraph also provides for the administration of the "Fund."
 {¶ 7} Additionally, the establishment of a single-county SWMD was contemplated by the parties in the agreement, and the agreement expressly states that the County shall make a good faith effort to obtain an exemption allowing for the creation of a single-county SWMD. In 1988, the County submitted an application for a C-2 exemption to the Director of the Ohio EPA, asking the Director to rely upon the County's agreement with St. Marys; the application indicates that the Landfill met or that improvements would be made in order to meet all of the necessary requirements for obtaining the C-2 exemption. The Ohio EPA approved the application and permitted Auglaize County to establish a single-county SWMD. Thereafter, the County established the Auglaize County Solid Waste Management District ("the District").
 {¶ 8} The parties operated under this agreement for ten years. Then, in June 1998 St. Marys closed the Landfill. The County continued to pay for the costs of environmental monitoring pursuant to the agreement for the next two years. Then, in December 2000 the County informed St. Marys that it would no longer perform the environmental monitoring function come January 1, 2001, asserting that the agreement with the city only lasted for twelve years and the County had fulfilled its monitoring obligation as of the end of the 2000 calendar year.
 {¶ 9} Thereafter, St. Marys filed suit against the County Board of Commissioners seeking to enforce its rights under the agreement. The parties filed cross-motions for partial summary judgment; St. Marys sought partial summary judgment on the issue of the County's obligation to pay for the costs of the entire thirty year post-closure monitoring period. The trial court issued a judgment entry denying the County's motion for partial summary judgment and granting St. Marys partial summary judgment, concluding that "the clear and unambiguous terms of the Agreement require the [County] to pay for all post-closure environmental monitoring costs at the St. Marys landfill for the entire 30-year post-closure monitoring period * * *."
 {¶ 10} The parties then filed cross-motions for summary judgment on the remaining issues in the case. In its March 7, 2005 judgment entry the trial court granted the County's motion for summary judgment, finding that St. Marys had breached the terms of the agreement by failing to establish a disposal rate pursuant to Paragraph 8 of the agreement and failing to set aside portions of that rate into a "Fund" to pay for environmental monitoring costs pursuant to Paragraph 9. The trial court then concluded that St. Marys' breach of the contract excused further performance of the County's obligations to pay for the costs of environmental monitoring at the Landfill. Accordingly, the trial court granted summary judgment in favor of the County and dismissed all of St. Marys' remaining claims.
 {¶ 11} St. Marys now appeals, asserting two assignments of error:
The trial court erred in granting the motion of [the] AuglaizeCounty Board of Commissioners for summary judgment.
 The trial court erred in denying the motion of [the] City ofSt. Marys for summary judgment.
Additionally, the County had cross-appealed, asserting one assignment of error:
The trial court erred in denying the Motion of [the County]for Partial Summary Judgment and granting the Motion of [the Cityof St. Marys] for Partial Summary Judgment.
 I. Length of the Monitoring Obligation {¶ 12} The first issue raised by the parties addresses the trial court's ruling under the first set of cross-partial summary judgment motions on the issue of the length of the County's monitoring obligations. The trial court granted partial summary judgment in favor of St. Marys on this issue, holding that there was no genuine issue of material fact that the County had agreed to pay the costs of environmental monitoring for the entire thirty-year post-closure period. In its cross-appeal, the County argues that the trial court erred in granting summary judgment on this issue in favor of St. Marys.
 {¶ 13} The standard of review for a grant of summary judgment is de novo. Lorain Natl. Bank v. Saratoga Apts. (1989),61 Ohio App.3d 127, 129. Thus, a grant of summary judgment will be affirmed only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In addition, summary judgment is not proper unless reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party. Id.; see Zivishv. Mentor Soccer Club, Inc. (1998), 82 Ohio St.3d 367, 369-70. Summary judgment should be granted with caution, with a court construing all evidence and deciding any doubt in favor of the nonmoving party. Murphy v. Reynoldsburg (1992),65 Ohio St.3d 345, 360.
 {¶ 14} The issue under these assignments of error is whether the agreement required the County to pay for post-closure environmental monitoring costs for the entire thirty-year statutory period or for the length of the agreement, which was twelve years. Thus, we are required to interpret the contract to determine whether the provisions extend the County's obligation to pay for post-closure monitoring costs beyond the term of the contract.
 {¶ 15} "Common words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument."Alexander v. Buckeye Pipe Line Co., (1978) 53 Ohio St.2d 241,245-246, 374 N.E.2d 146 (citations omitted). As previously mentioned, Paragraph 5 of the contract provides that the County will "undertake responsibility for all environmental monitoring required for the [Landfill] by applicable statutes andregulations * * * both prior to and subsequent to the closure ofthe site." Therefore, the County agreed to perform the monitoring obligation for the entire post-closure period required by the applicable statutes and regulations, in this case thirty years. Moreover, the County agreed to take "complete" responsibility for "all" of the environmental monitoring required. Under their plain and ordinary meaning, those words mean that the County took responsibility for the entire amount of the costs for the statutory term.
 {¶ 16} Accordingly, we agree with the trial court that under the clear and unambiguous language of the agreement, the County agreed to pay the costs of environmental monitoring for the entire thirty-year post-closure period. That obligation was not limited to the twelve-year length of the contract. Based on this conclusion, the County's assignment of error is overruled. The judgment of the trial court granting summary judgment on the issue of the length of the County's environmental monitoring obligation under the agreement is affirmed.
 II. Performance under the Agreement {¶ 17} Following the trial court's grant of partial summary judgment on the length of the monitoring obligation, the parties filed a second set of cross-summary judgment motions. In its motion, the County argued that St. Marys had materially breached the agreement in several ways. The trial court accepted this argument, finding that St. Marys breached the contract by failing to conduct annual rate studies and by failing to set aside portions of the disposal rate into a "Fund" to be used to pay the costs of environmental monitoring. In its first assignment of error, St. Marys argues that the trial court erred in granting summary judgment in favor of the County on the ground that St. Marys breached the agreement.
 {¶ 18} As previously mentioned, the standard of review for a grant of summary judgment is de novo. Lorain Natl. Bank,61 Ohio App.3d at 129. Thus, a grant of summary judgment will be affirmed only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).
 {¶ 19} The central issue in this assignment of error surrounds the trial court's interpretation of paragraphs eight and nine of the agreement, which required St. Marys to establish a rate and a Fund for paying environmental monitoring costs. Specifically, Paragraph 8 provides:
Upon Commencement of this Agreement, [St. Marys] shallestablish a rate for the disposal of solid waste at the[Landfill] as follows:
 a. [T]he rate shall be set by the City using an objectivethird party acceptable to the Parties hereto, who shall conduct arate study that shall take into account operating costs, thepotential need for expansion, the need to create a reasonableindex * * * that can be used to calculate periodic adjustments tothe rate, the requirements of the Fund established pursuant toParagraph 9, infra, and other relevant factors deemed necessaryby the objective third party conducting the rate study;
 b. [T]he rate may reflect that residents of the County who arenot residents of the City may be charged a surcharge to reflectthe investments made by the City in the [Landfill];
 c. [T]he rate shall be reviewed annually by the City and maybe modified pursuant to the index established during the ratestudy referenced in Paragraph 8(a), supra.
There is no definition of "rate" in the agreement, or a provision stating whether the rate is to be charged by the city, the county, or both. The provision only specifies that St. Marys is to make the ultimate determination what the rate is and that the city must do so with the help of an independent third party. Additionally, Paragraph 9 of the agreement provides:
9. The Parties agree that a portion of the rate establishedpursuant to Paragraph 8(a), supra, shall be set aside for thecreation and maintenance of a fund, which shall be used andadministered as follows:
 a. [A] portion of the Fund shall be allocated to pay the costsof environmental monitoring of the [Landfill] * * * both prior toand subsequent to the closure of the [Landfill], to the extentthat such environmental monitoring is required by the applicablestatutes and regulations; the portion of the Fund to be set asideand accumulated for such monitoring purposes shall be establishedby the rate study to be conducted pursuant to Paragraph 8, supra,and may be periodically adjusted in accordance with the indexestablished by that study; provided, however, that to theextent that the costs of environmental monitoring subsequent tothe closure of the [Landfill] exceed the amounts set asidepursuant to this subparagraph, the County shall bear those costspursuant to Paragraph 5(a), supra[.] (Emphasis added).
There is no provision in the agreement indicating which party is to establish this fund; however, Paragraph 9(d) states that "the fund shall be administered by the Board of the SWMD * * *."
 {¶ 20} Accordingly, these two provisions of the contract are exceedingly ambiguous as to the obligations of the parties, specifically, how the rate is to be charged and how the "Fund" is to be created. A contract term is ambiguous if it is susceptible to more than one reasonable interpretation. U.S. Fidelity andGuaranty Co. v. St. Elizabeth Med. Ctr. (1998),129 Ohio App.3d 45, 716 N.E.2d 1201; Westfield Ins. Co. v. Galatis,100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 11-12. The term requiring St. Marys to establish a "rate for the disposal of solid waste" is ambiguous because there is more than one interpretation as to what constitutes the "rate." The term requiring the parties to establish the Fund is ambiguous because it does not specify which party has the obligation of establishing that Fund or which portion of the "rate" is to be set aside into the Fund.
 {¶ 21} When the provisions of a contract are ambiguous, courts look to the performance by the parties as an indication of their interpretation of the agreement. See State ex rel. Burgess Niple v. Linzell (1950), 153 Ohio St. 545, syllabus. InLinzell, the Supreme Court of Ohio held:
Where * * * words used in a contract are reasonablysusceptible to more than one interpretation and the parties tosuch contract have by their acts and conduct in the performanceof the contract over a reasonable period of time mutually adoptedone of those interpretations, the interpretation so adopted willbe given those words.
Id. Thus, the practical construction given to the terms of a contract by the parties will assist the court in giving meaning to ambiguous terms. Consolidated Mgmt., Inc. v. Handee Marts
(1996), 109 Ohio App.3d 185, 191 (citations omitted). Therefore, because the terms in Paragraphs 8 and 9 of the agreement are ambiguous, we will look to how the parties performed under the agreement.
 {¶ 22} After the agreement was reached, the parties agreed that John Hull of Hull Associates would serve as an objective third party to conduct a rate study as required in the contract; Hull had previously worked with St. Marys as an environmental consultant, and later served as a consultant for the County as well. Hull conducted a rate study in 1989, and initially made several recommendations to the parties. Hull initially recommended that St. Marys increase its "gate fee" by $7.00 per ton in order to pay for various expenses necessary to obtain the C-2 exemption. In recommending this rate increase, Hull took into consideration the need for immediate groundwater monitoring as well as the environmental monitoring costs for the required thirty-year post-closure period.
 {¶ 23} However, the agreement also contemplated "a surcharge to reflect the investment made by the City in the [Landfill];" H.B. 592 also permitted the SWMD to establish a surcharge. Hull recommended to the Board of the SWMD that they establish a "district surcharge" of $5.24 per ton — a surcharge permitted by these provisions — to cover the costs of incorporating the "best available technology" requirements necessary to obtain a C-2 exemption. However, Hull also noted that this surcharge also took into consideration the costs of environmental monitoring. Then, Hull suggested, "Prior to the initial district surcharge implementation [the Landfill] should adjust [its] gate fee so that monitoring fees, etc., are not included in both the gate fee and the surcharge." Following this recommendation, the district established a surcharge at the rate of $5.24 per ton, and St. Marys did not increase its gate fee by the previously recommended $7.00 per ton.
 {¶ 24} Accordingly, the parties jointly established fees and surcharges following the recommendation of Hull, the "independent third party" agreed to by the parties. Hull's recommendation took into consideration operating costs, the potential need for expansion, and the need to set aside funding to pay for future environmental monitoring costs. Furthermore, the parties adjusted these rates periodically over the course of the next twelve years. At no time during the period the parties performed under the contract did the County object to this method of financing the monitoring costs at the Landfill. Therefore, based on the course of performance by the parties, we find that the "rate for the disposal of solid waste" included both the "gate fees" charged by the city and the separate "district surcharge."
 {¶ 25} In Paragraph 9, the agreement requires that a portion of that rate must be set aside for the creation of a Fund to pay the costs of post-closure environmental monitoring. The portion to be set aside was to be established pursuant to the rate study conducted by Hull. The agreement does not specify which party was required to establish the Fund; however, it does indicate that "the Fund shall be administered by the Board of the SWMD established pursuant to C-2 exemption * * *." The record makes clear that the County was in control of the Board of the SWMD, as it was single-county SWMD and the County Commissioners served as the Board of the SWMD. Therefore, the task of establishing and maintaining the Fund fell to the County.
 {¶ 26} The trial court found, however, that it was the city's responsibility to determine the amount to be set aside into the Fund, and it was the city's responsibility to set aside a portion of the disposal rate into the Fund. However, we see no provision in the contract requiring St. Marys to make this determination. The agreement says only that the disposal rate must take into account the needs of maintaining the monitoring Fund. The agreement does not specify an exact amount to be set aside; that amount must be determined by the rate study.
 {¶ 27} As previously discussed, the course of performance by the parties demonstrates that they mutually established gate fees and surcharges sufficient to pay the costs of environmental monitoring according to the rate study conducted by Hull. The record makes clear that St. Marys paid significant amounts to the County over the course of the twelve years following the agreement; what remains unclear is how the County allocated these monies. A 1994 Annual Report indicates that St. Marys paid over to the County $32,529.45 in 1989, over $200,000 in 1990, $170,000 in 1991, and over $200,000 in 1992. These fees reflect the district surcharges established pursuant to the rate study in 1989, a surcharge established in part to cover the costs of post-closure environmental monitoring. The County never objected to this method of setting aside monies to pay for post-closure monitoring. Accordingly, the course of performance by the parties over twelve years gives meaning to the provisions of the contract, and indicates that funds were set aside from the total disposal rate for post-closure monitoring.
 {¶ 28} Moreover, later actions by the County indicated that money had been set aside for post-closure environmental monitoring in accordance with Paragraph 9 of the agreement. After the initial disposal rate was set, the County began charging "disposal fees" and later "generation fees." The County Commissioners indicated that these fees were to create revenues to cover the post-closure monitoring period. The County indicated as much to the Ohio EPA when it submitted updated solid waste disposal plans in 1992 and 1996. Moreover, the 1996 plan states that the SWMD had established a fund to pay for post-closure monitoring and had set aside monies into this fund each year.[1] This correlates to the County's responsibility to manage the Fund pursuant to Paragraph 9(d).
 {¶ 29} Therefore, the performance of the parties over the course of the twelve year period following the agreement demonstrates that the parties agreed to an initial fee structure which incorporated the need to pay for post-closure monitoring, and that portions of the revenues generated by these fees were given to the County for purposes of establishing and maintaining this fund. Accordingly, the performance of the parties during this period gives meaning to the terms of the agreement; the evidence in the record demonstrates that St. Marys fulfilled all of its obligations under the agreement pertaining to establishing a rate and setting asides portions of that rate for environmental monitoring.
 {¶ 30} Moreover, nothing in the agreement makes the County's obligations with respect to paying the costs of post-closure monitoring contingent on St. Marys' performance. A condition precedent "calls for the performance of some act or the happening of some event after the contract is entered into, and upon the performance or happening of which its obligation is made to depend." Mumaw v. Western Southern Life Ins. Co. (1917),97 Ohio St. 1, 119 N.E. 132. Under the contract, the County agreed to "undertake complete responsibility for all environmental monitoring and any capital expenditures necessary to accomplish the monitoring, both prior to and subsequent to closure of the [Landfill]." The only condition precedent on that obligation was St. Marys obtaining approval by the Ohio EPA of an initial monitoring program, an obligation which was clearly performed. Nothing in the contract makes the County's obligation to pay the costs of environmental monitoring contingent on establishing the disposal rate under Paragraph 8 or establishing the Fund pursuant to Paragraph 9.
 {¶ 31} Finally, even if we were to conclude that establishing the Fund and setting aside monies into that fund were a condition precedent to the County's obligation to pay the costs of post-closure environmental monitoring, the County has waived performance of the condition. "[I]t is a basic principle of contract law that a party to a contract who would benefit from a condition precedent to its performance may waive that condition."Sweeney v. Grange Mut. Cas. Co. (2001), 146 Ohio App.3d 380,385, 766 N.E.2d 212. A condition precedent may be waived by the conduct and performance of the party asserting the condition. SeeOhio Farmers Ins. Co. v. Cochran (1922), 104 Ohio St. 427, ¶ 3 of the syllabus, 135 N.E. 537. The parties performed under the contract for twelve years; any condition precedent was waived due to this extended performance, and the County cannot now assert the failure of the condition as excusing its performance obligations.
 {¶ 32} Accordingly, we find that reasonable minds could only conclude that St. Marys properly performed under the contract, and therefore the trial court erred in granting summary judgment in favor of the County. Based on the foregoing, St. Marys' first assignment of error is sustained, and the judgment of the trial court is reversed on that issue.
 {¶ 33} Moreover, due to our conclusion that St. Marys properly performed under the contract, and due to the previous conclusion that the County was obligated to continue paying the environmental monitoring costs after the contract expired in 2000, there is no genuine issue of material fact that remains and St. Marys is entitled to judgment as a matter of law. The uncontroverted evidence in the record indicates that the County stopped performing its monitoring obligations in December 2000; the County admitted as much when it informed St. Marys that it would no longer perform these functions. Thus, the County was in breach of its obligations under the agreement when it stopped paying the monitoring costs, and no genuine issue of material fact remains regarding this issue. Accordingly, the trial court erred in failing to grant St. Marys' second motion for summary judgment because reasonable minds can only conclude that the County breached its obligations under the agreement. St. Marys' second assignment of error is sustained.
 III. Conclusion {¶ 34} Based on the foregoing analysis, we find that the trial court was correct in granting St. Marys' motion for partial summary judgment on the length of the County's monitoring obligations. Therefore, the trial court's initial judgment entry granting that motion is affirmed. However, because the County was obligated to monitor the Landfill for the full thirty-year post-closure period, the County was in breach of its obligations under the agreement and summary judgment should have been granted in favor of St. Marys on the remaining issues. Accordingly, the judgment of the trial court granting summary judgment in favor of the County and denying St. Marys' second motion for summary judgment is reversed, and the case is remanded to the trial court for issuance of summary judgment in favor of St. Marys.
Judgment affirmed in part and reversed in par
 Bryant, P.J., and Rogers, J., concur.
[1] Although the County indicated to the Ohio EPA that a fund had been established, there is no evidence in the record demonstrating whether the fund was actually established.