THE CITY OF ST. MARYS, APPELLEE, *v.* AUGLAIZE COUNTY BOARD OF COMMISSIONERS, APPELLANT.

[Cite as *St. Marys v. Auglaize Cty. Bd. of Commrs.,*
115 Ohio St.3d 387, 2007-Ohio 5026.]

(No. 2006–1033—Submitted May 22, 2007—Decided October 3, 2007.)

LUNDBERG STRATTON, J.

## I.  Introduction

{¶ 1} This case involves a dispute arising out of an agreement between a county and city for managing the disposal of solid waste.  We accepted the county's three propositions that pertain to the interpretation of the agreement. We also accepted the issue whether a county's fiscal officer had to comply with R.C. 5705.41(D)(1), which requires the county to certify the availability of public funds before the county could agree to pay for the environmental monitoring of the city's landfill pursuant to the agreement.

{¶ 2} For the reasons explained below, we find in favor of the city with regard to the contractual dispute.  We also hold that the county's contractual obligation to pay for the environmental monitoring of the landfill was excepted from the certification requirements of R.C. 5705.41(D) by R.C. 5705.44.  Consequently, we affirm the judgment of the court of appeals in favor of the city.

## II. Facts and Procedure

{¶ 3} Appellant is the Auglaize County Board of Commissioners ("county"). Appellee is the city of St. Marys, Ohio. The city owns and operates a landfill for disposing of solid waste.

{¶ 4} Effective June 24, 1988, Am.Sub.H.B. No. 592, 142 Ohio Laws, Part III, 4418, established statewide policies for the management of solid and hazardous waste. *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.* (1995), 73 Ohio St.3d 590, 596, 653 N.E.2d 646. The bill enacted R.C. 3734.52, which requires each county in Ohio to either form a single-county solid-waste-management district ("SWMD") or participate in a joint solid-waste-management district for the purpose of "orderly development of the solid waste management planning." Section 6(C)(1), Am.Sub.H.B. No. 592, see also *Fairfield Cty. Dist. Bd. of Health v. Shank* (May 23, 1991), 10th Dist. No. 90AP–1176, 1991 WL 96362. In order to maintain a single-county SWMD, a county with a population under 120,000 was required to acquire an exemption from the Ohio Environmental Protection Agency ("EPA") under R.C. 3734.52(C)(2). In order to obtain this exemption, the county had to demonstrate that it had access to a solid-waste-disposal facility with sufficient capacity to accept the county's solid waste for at least ten years. R.C. 3734.52(C)(2).

{¶ 5} Auglaize County desired to form a single-county SWMD, and because it had a population of less than 120,000, it needed an R.C. 3734.52(C)(2) exemption. On December 22, 1988, the county executed an agreement with the city that permitted the county to dispose of its solid waste in the city's landfill. In return, the county agreed to pay for the environmental monitoring of the city's landfill. The term of the agreement was 12 years.

{¶ 6} On February 17, 1989, the EPA approved the county's exemption, and the county formed the Auglaize County Solid Waste Management District. The county commissioners served as the board of directors for the district as required by R.C. 343.01.

{¶ 7} The policy committee of the district completed its initial plan for solid-waste management in early 1992. The plan set fees and proposed various plans and activities associated with the management and disposal of solid waste, such as the construction of a recycling center.

{¶ 8} In the early to mid 1990s, it became apparent that the city either had to expand or close the landfill. Ultimately, the city closed the landfill in June 1998. Nevertheless, the county continued to pay the costs of environmental monitoring of the landfill through December 2000.

{¶ 9} The city, which claimed that the county was obligated to pay all environmental-monitoring expenses during the 12–year term of the agreement

and for 30 years after the landfill closed, sued the county for breach of the agreement after the county stopped paying for the monitoring of the landfill. The parties filed cross-motions for partial summary judgment. The trial court granted partial summary judgment to the city, holding that the agreement obligated the county to pay for postclosure monitoring of the landfill for 30 years even though the agreement had terminated.

{¶ 10} The parties then filed cross-motions for summary judgment on the remaining issues. The county argued that it was not obligated to pay for the monitoring, because the city had breached the agreement by failing to set aside a portion of its gate fees into a fund to pay in part for the monitoring costs. (Gate fees were the fees charged by the city for the disposal of solid waste at the landfill.) The court again recognized that the agreement required the county to pay for the monitoring, but it held that the city's failure to set aside a portion of its gate fees resulted in a breach of the contract that relieved the county of its obligation to pay for monitoring. Thus, the court granted summary judgment to the county and dismissed the city's complaint.

{¶ 11} The city appealed. The court of appeals affirmed the trial court's holding that the county had a duty to pay for postclosure environmental monitoring for 30 years after expiration of the agreement but reversed the trial court's finding that the city breached the agreement. *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 3d Dist. No. 2–05–17, 2006-Ohio-1773, 2006 WL 903586, ¶ 16, 32. The court of appeals held that the agreement was ambiguous regarding the city's obligation to contribute to the cost of environmental monitoring but that the parties' course of conduct gave meaning to the agreement. Id. at ¶ 21, 29. Accordingly, the court reversed and remanded the cause to the trial court to issue summary judgment in the city's favor.

{¶ 12} The cause is before this court pursuant to our acceptance of the county's discretionary appeal.

### III. Analysis

{¶ 13} We begin our analysis by examining the language of the parties' agreement.

#### A. The Agreement

##### 1. The County's Obligation to Monitor the Landfill Survives Termination of the Agreement

{¶ 14} The county argues that its contractual obligation to pay for the environmental monitoring of the landfill ended when the agreement terminated in 2000. The city counters that the agreement imposes an obligation on the county to pay for postclosure monitoring beyond the termination date of the agreement.

{¶ 15} Paragraph 5 of the agreement requires the county to monitor the landfill:

{¶ 16} "Pursuant to this agreement, the County shall:

{¶ 17} "a. as soon as the monitoring program initiated by the City pursuant to paragraph 4(f) * * * is approved by the OEPA, undertake *complete responsibility* for all environmental *monitoring* required for the City Site by applicable statutes and regulations, including the operation of such environmental monitoring and any capital expenditures to accomplish the monitoring, both prior to and *subsequent to closure of the site*." (Emphasis added.)

{¶ 18} The role of courts in examining contracts is to ascertain the intent of the parties. *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.* (1999), 86 Ohio St.3d 270, 714 N.E.2d 898. Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 652 N.E.2d 684.

{¶ 19} The term of the agreement was 12 years. But the plain language of the agreement provided that once the city initiated monitoring of the landfill as approved by the EPA, the county assumed "complete responsibility for all environmental monitoring required * * * by applicable statutes and regulations * * * both prior to and *subsequent to closure of the site*." (Emphasis added.)

{¶ 20} We presume that the parties intended for the landfill to remain open for the entire 12–year term. Thus, the language requiring the county to pay for monitoring "subsequent to closure of the site" clearly intended that the county's obligation to monitor the landfill extended beyond the termination of the agreement.

{¶ 21} Accordingly, we hold that the county's obligation to pay for the environmental monitoring of the landfill survived the December 22, 2000 termination date of the agreement and required the county to pay for postclosure monitoring for the entire period that monitoring was required by law.

## 2. The Parties' Course of Conduct Controls

{¶ 22} In its second and third propositions of law, the county essentially argues that the agreement was not ambiguous, and therefore the court of appeals erred in relying on the parties' course of conduct to interpret the agreement. More specifically, the county argues that the agreement required the city to establish a "rate for the disposal of solid waste" and equates this rate with the city's gate fees. The county further alleges that under the agreement, the city was required to set aside a portion of that rate into a fund, part of which was to be used to finance the monitoring of the landfill. Finally, the county alleges that the city breached the agreement by failing to set aside any portion of its gate fees and

therefore the county was discharged from its obligation to pay for monitoring the landfill.

{¶ 23} Paragraphs 8 and 9 of the agreement address the city's rate for the disposal of solid waste and the creation of a fund to be used to pay for environmental monitoring.

{¶ 24} Paragraph 8 provides:

{¶ 25} "Upon commencement of this agreement, the City shall establish a *rate for the disposal of solid waste* at the City Site as follows:

{¶ 26} "a. [T]he rate shall be set by the City using an objective third party acceptable to the Parties hereto, who shall conduct a rate study that shall take into account operating costs, the potential need for expansion, the need to create a reasonable index (e.g., an index composed of the Consumer Price Index and other appropriate indicators) that can be used to calculate periodic adjustments to the rate, the requirements of the Fund established pursuant to Paragraph 9, infra, and other relevant factors deemed necessary by the objective third party conducting the rate study.

{¶ 27} "b. [T]he rate may reflect that residents of the County who are not residents of the City may be charged a surcharge to reflect the investment made by the City in the City Site;

{¶ 28} "c. [T]he rate shall be reviewed annually by the City and may be modified pursuant to the index established during the rate study referenced in Paragraph 8(a), supra."

{¶ 29} Paragraph 9 of the agreement provides:

{¶ 30} "The Parties agree that *a portion of the rate* established pursuant to Paragraph 8(a), supra, *shall be set aside* for the creation and maintenance of a *fund* ('Fund'), which shall be used and administered as follows:

{¶ 31} "a. [A] portion of the Fund shall be allocated to *pay the costs of environmental monitoring* of the City Site, and other sites for the disposal of solid waste that may be established and operated by the Parties during the term of this Agreement, both prior to and subsequent to the closure of the City Site or additional sites established and operated by the Parties during the term of this agreement, to the extent that such environmental monitoring is required by applicable statutes and regulations; the portion of the Fund to be set aside and accumulated for such monitoring purposes shall be established by the rate study to be conducted pursuant to Paragraph 8, supra, and may be periodically adjusted in accordance with the index established by that study; provided, however, that to the extent that the costs of environmental monitoring subsequent to the closure of the City Site exceed the amounts set aside pursuant to

this subparagraph, the County shall bear those costs pursuant to Paragraph 5(a) * * *;

{¶ 32} "b. [O]ne half of the remainder of the Fund, that is the portion that is not allocated pursuant to Paragraph 9(a), shall be set aside for contingent liabilities that the Parties may incur with respect to the past, present and future operation of the City Site, and other legitimate purposes with respect to the past, present and future operation of the City Site;

{¶ 33} "c. [T]he remainder of the Fund, that is the portion remaining following the allocations described in Paragraph 9(a) and (b), shall be set aside for contingent liabilities that the Parties may incur with respect to the operation of any additional sites established and operated by the parties during the term of this Agreement, planning for additional sites, and other legitimate purposes with respect to the past, present, and future operation of any additional sites established and operated by the Parties during the term of this agreement;

{¶ 34} "d. [T]he Fund shall be administered by the *Board* of the SWMD established pursuant to the C–2 exemption referenced in Paragraph 1." (Emphasis added.)

{¶ 35} The court of appeals held that paragraphs 8 and 9 did not clearly state how the rate would be charged or how much of the rate needed to be set aside in the fund. 2006-Ohio-1773, 2006 WL 903586, ¶ 20. To resolve these ambiguities, the court of appeals looked to the practical construction given to the terms of the contract by the parties. Id. at ¶ 21.

{¶ 36} The court of appeals concluded that the "rate" referred to in the agreement was set pursuant to the recommendation of an agreed-upon third-party consultant, John Hull, and that Hull had also recommended that the district levy fees or increase fees to fund environmental monitoring. From this, the court determined that the rate included the city's gate fees and a separate surcharge imposed by the district.

{¶ 37} The court of appeals further determined that the portion of the rate to be set aside was also to be determined by the rate study. Because the county administered the fund, the obligation of establishing and maintaining the fund fell on the county. The court of appeals determined that the city had remitted to the county the district's surcharge fees, which were established in part to fund the postclosure environmental monitoring. The court of appeals concluded that the parties operated in this fashion for over 12 years without any objection. Thus, it concluded, the city had fulfilled its obligations under paragraphs 8 and 9 of the agreement.

{¶ 38} Contract interpretation is a matter of law, and questions of law are subject to de novo review on appeal. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,* 73 Ohio St.3d at 108, 652 N.E.2d 684.

{¶ 39} Parties may implicitly modify an agreement by their actions. *Automated Solutions Corp. v. Paragon Data Sys., Inc.,* 167 Ohio App.3d 685, 2006-Ohio-3492, 856 N.E.2d 1008. " 'A continued, different, "course of performance" between parties manifests a modification of the original agreement.' " Id. at ¶ 29, quoting *Schmidt v. Texas Meridian Resources* (Dec. 30, 1994), Washington App. No. 94CA12, 1994 WL 728059. Finally, " 'the practical construction made by the parties may be considered by the court as an aid to its construction when the contract is ambiguous, uncertain, doubtful, or where the words thereof are susceptible to more than one meaning, *or when a dispute has arisen between the parties after a period of operation under the contract.*' " (Emphasis sic.) *Consol. Mgt., Inc. v. Handee Marts, Inc.* (1996), 109 Ohio App.3d 185, 191, 671 N.E.2d 1304, quoting 18 Ohio Jurisprudence 3d (1980) 46, Contracts, Section 160; see also *Natl. City Bank of Cleveland v. Citizens Bldg. Co. of Cleveland* (1947), 48 Ohio Law Abs. 325, 335, 74 N.E.2d 273 ("Where a dispute arises relating to an agreement under which the parties have been operating for some considerable period of time, the conduct of the parties may be examined in order to determine the construction which they themselves have placed upon the contract * * * ").

{¶ 40} Paragraph 8 of the agreement does provide that "the City shall establish a rate for the disposal of solid waste" and later states that "the rate shall be set by the City." However, according to the same paragraph, the rate was to be set by "an objective third party acceptable to the Parties" who was to conduct a rate study that took into account operating costs. The city and the county agreed to use Hull as that third party.[1]

{¶ 41} The rate study completed by Hull in 1989 proposed three alternative increases to the city's gate fees. The study also contemplated environmental-monitoring costs.

{¶ 42} After the city objected to the amount of the initial proposed increases, Hull then recommended that the city increase its gate fee to $7 per ton, which he thought "should be sufficient to generate the required funds necessary to install the groundwater monitoring wells and to perform initial monitoring."

{¶ 43} However, paragraph 8b of the agreement also allowed the district to levy a "surcharge," and Hull recommended that the surcharge be set at $5.24 per ton, which would cover the initial costs of environmental monitoring.[2] On June 6, 1989, the district approved a surcharge of $5 per ton.

---

1. The city initially hired Hull and later the county hired Hull as a consultant.

2. The letter noted that the city was currently considering an increase in its gate fee to $7 per ton to help pay for environmental monitoring, "but suggested that prior to the initial district surcharge

{¶ 44} Thus, we find it reasonable to conclude that the rate referred to in paragraph 8 of the agreement included both the city's gate fee and the county's surcharge.

{¶ 45} The agreement required that the fund be administered by the district's board. The district created, maintained, and administered an environmental-monitoring fund that was funded annually by the surcharges. Yet, despite administering the fund and therefore being aware of the sources of revenue for the funding, the county never objected to the method of funding during and even beyond the expiration of the agreement, until now. In other words, the district levied and collected a fee, which in part financed the cost of the environmental monitoring that the county was obliged to perform, and paid monitoring costs during the term of the agreement without the county ever complaining that the city had not contributed to the fund.

{¶ 46} We conclude that the conduct of the city and the county over a period of years demonstrates that they agreed to a rate that incorporated the need to pay for postclosure monitoring, that a portion of that rate was placed into a fund that was used to pay for the environmental monitoring of the city's landfill, and therefore, that the city satisfied its obligations under paragraphs 8 and 9 of the agreement. Accordingly, we affirm the court of appeals' judgment in favor of the city regarding its obligations under paragraphs 8 and 9 of the agreement.

### B. Certification by the County Auditor

{¶ 47} The county also argues that the county auditor never certified that the amount the county needed to meet its contractual obligation to pay for the environmental monitoring of the landfill agreement was available under R.C. 5705.41(D) and therefore that the contract was void. See *Lancaster v. Miller* (1898), 58 Ohio St. 558, 51 N.E. 52, paragraphs two and three of the syllabus.

{¶ 48} The city argues that the county's expenditure for environmental monitoring falls within any one of several exceptions to the certification requirement of R.C. 5705.41(D). In particular, the city argues that the county's expenditures for monitoring were excepted from the certification requirement by R.C. 5705.44 because the funds expended on the environmental monitoring were from the earnings of a public utility.

{¶ 49} Generally a "subdivision" or "taxing authority" (which includes a county[3]) cannot enter into a contract that requires spending public money unless the

---

implementation, the landfill should adjust its gate fee so that monitoring fees, etc., were *not included* in the gate fee and the surcharge." (Emphasis added.) Arguably, this language suggests that the city was not obligated to use its gate fees to pay for monitoring costs.

3. R.C. 5705.01(A) provides that " '[s]ubdivision' means any county * * *."

fiscal officer of that subdivision certifies that the entire amount required to satisfy the obligation has been appropriated for that purpose and is available and unencumbered. R.C. 5705.41(D)(1). "The purpose in requiring such certificate to be made and in prohibiting public officials entering into any such contracts unless such certificate is first made is clearly to prevent fraud and the reckless expenditure of public funds, but particularly to preclude the creation of any valid obligation against the county above or beyond the fund previously provided and at hand for such purpose." *State v. Kuhner* (1923), 107 Ohio St. 406, 413, 140 N.E. 344; see, also, *Riverside Corp. v. Cincinnati* (Feb. 27, 1980), 1st Dist. No. C–780794, 1980 WL 352742, *6 (the certification requirement is a "means of protecting the public treasury").

### 1. Payments Made from Earnings of Public Utilities Are Excepted from Certification

{¶ 50} There are several exceptions to the general rule requiring the fiscal officer of a subdivision to certify that funds are available. One is located in R.C. 5705.44, which provides:

{¶ 51} "The *certificate* required by section 5705.41 of the Revised Code as to money in the treasury *shall not be required* for contracts on which *payments are to be made from the earnings* of a publicly operated water works or *public utility,* but in the case of any such contract made without such certification, no payment shall be made on account thereof, and no claim or demand thereon shall be recoverable, except out of such earnings." (Emphasis added.)

{¶ 52} Thus, any payments made from the earnings of a public utility are excepted from the certification requirement of R.C. 5705.41(D). The critical question in this case is whether an SWMD is a public utility, as that term is used in R.C. 5705.44.

{¶ 53} R.C. 5705.44 does not define "public utility," and there are no cases interpreting R.C. Chapter 5705 that define the term. While "public utility" is defined in other titles of the Revised Code, we have held that " 'those definitions are relevant solely to the statutory chapters in which they are located' " and thus are irrelevant in defining "public utility" in other contexts. *Castle Aviation, Inc. v. Wilkins,* 109 Ohio St.3d 290, 2006-Ohio-2420, 847 N.E.2d 420, ¶ 20, quoting *Vernon v. Warner Amex Cable Communications, Inc.* (1986), 25 Ohio St.3d 117, 119, 25 OBR 164, 495 N.E.2d 374. Instead, we look to case law for a definition.

{¶ 54} Determination of whether a particular entity is a public utility is a mixed question of law and fact. *Marano v. Gibbs* (1989), 45 Ohio St.3d 310, 311, 544 N.E.2d 635. Whether an entity "is operating as a public utility is determined by the character of the business in which it is engaged." *Indus. Gas Co. v. Pub.*

*Util. Comm.* (1939), 135 Ohio St. 408, 14 O.O. 290, 21 N.E.2d 166, paragraph one of the syllabus.

{¶ 55} Although case law defines numerous attributes common to public utilities, it is generally recognized that none are controlling. *Montville Bd. of Twp. Trustees v. WDBN, Inc.* (1983), 10 Ohio App.3d 284, 10 OBR 400, 461 N.E.2d 1345. Thus, each case must be determined on its own facts. *Indus. Gas Co. v. Pub. Util. Comm.*, 135 Ohio St. at 413, 14 O.O. 290, 21 N.E.2d 166.

{¶ 56} One of the most important attributes of a public utility is that it provides "an essential good or service to the general public which has a legal right to demand or receive this good or service." *A & B Refuse Disposers, Inc. v. Ravenna Twp. Bd. of Trustees* (1992), 64 Ohio St.3d 385, 387, 596 N.E.2d 423; *Freight, Inc. v. Northfield Ctr. Bd. of Twp. Trustees* (1958), 107 Ohio App. 288, 292–293, 8 O.O.2d 212, 158 N.E.2d 537; *Motor Cargo, Inc. v. Richfield Bd. of Twp. Trustees* (C.P.1953), 67 Ohio Law Abs. 315, 52 O.O. 257, 117 N.E.2d 224.

{¶ 57} Further, the good or service must be provided to the public "generally and indiscriminately." *S. Ohio Power Co. v. Pub. Util. Comm.* (1924), 110 Ohio St. 246, 143 N.E. 700, paragraph two of the syllabus; see also *Marano*, 45 Ohio St.3d at 311, 544 N.E.2d 635.

{¶ 58} Finally, a public utility must conduct "its operations in such a manner as to be a matter of public concern." *A & B Refuse Disposers*, 64 Ohio St.3d at 388, 596 N.E.2d 423. In determining whether an entity conducts itself in such a way as to become a matter of public concern, courts look to the good or service provided, competition in the local marketplace, and regulation by a governmental authority. Id.

### a. The District Provides an Essential Service

{¶ 59} An SWMD is responsible for preparing a plan for solid-waste management and providing for "the safe and sanitary management of solid wastes" within the district's territory. R.C. 3734.52. One of the primary requirements of the plan is that the district must secure access to a solid-waste-management facility with sufficient capacity to accept disposal of all of the district's solid waste for ten years. R.C. 3734.53(A).

{¶ 60} This court has recognized that collecting and disposing of garbage is necessary to protect public health. *Broughton v. Cleveland* (1957), 167 Ohio St. 29, 33, 4 O.O.2d 1, 146 N.E.2d 301; see also *Weber v. Butler Cty. Bd. of Health* (1947), 148 Ohio St. 389, 405, 35 O.O. 351, 74 N.E.2d 331 (Zimmerman, J., dissenting) (county health board has authority to enforce rules that require persons to prohibit persons from disposing of trash in a manner that may be unhealthy to others); *Portsmouth v. McGraw* (1986), 21 Ohio St.3d 117, 21 OBR 422, 488 N.E.2d 472, syllabus (municipality may enforce ordinance that requires

all residents who accumulate trash to use a municipal garbage-collection service). We find that the implementation of an SWMD's plan for the safe and efficient disposal of solid waste is consistent with, and falls within, the necessary service of collecting and disposing of garbage.

{¶ 61} In the instant case, the district developed a plan for the management of solid waste that included programs aimed at collecting, processing, and marketing recyclable waste; educating the public about the disposal of household hazardous waste; and composting. Most important, the district secured an agreement with the city for the city to accept all the county's solid waste for at least ten years. Accordingly, we hold that the district provided an essential service.

### b. The District Provides Its Service Indiscriminately and Reasonably

{¶ 62} An SWMD has jurisdiction over "all of the incorporated and unincorporated territory of the county" for purposes of implementing its solid-waste-management plan. R.C. 3734.52(A). Furthermore, the plan has to show that the district can provide access to a solid-waste-disposal facility with sufficient capacity to accept the county's solid waste for at least ten years.

{¶ 63} In the instant case, statutory law requires the district to prepare solid-waste-disposal plans for the foreseeable future. Further, the district had jurisdiction over all of the territory within Auglaize County regarding disposal of its solid waste. The district contracted with the city to dispose of the solid waste generated by the residents of Auglaize County in the city's landfill for ten years. Thus, we hold that the district provides its services reasonably and indiscriminately to all the residents within Auglaize County.

### c. The District Qualifies as a Matter of Public Concern

{¶ 64} In *A & B Refuse Disposers,* this court held that regulation of a landfill pursuant to R.C. Chapter 3734 did not qualify the landfill as a matter of public concern. 64 Ohio St.3d at 390, 596 N.E.2d 423. We must determine what effect *A & B Refuse Disposers* has, if any, in determining whether an SWMD regulated under R.C. Chapter 3734 qualifies as a matter of public concern.

{¶ 65} In *A & B Refuse Disposers,* the court addressed whether a privately owned sanitary landfill was a public utility that could be exempted from local zoning requirements. The owner of the landfill argued that state regulation of a waste-disposal facility, under R.C. Chapter 3734, qualified a sanitary landfill as a matter of public concern. This court determined that R.C. Chapter 3734 sought to protect the environment and human health but that public concern as it related to a public utility arose "from the monopolistic aspects of the entity and the nature of the business in which it [was] engaged." *A & B Refuse Disposers,* 64 Ohio St.3d at 389, 596 N.E.2d 423. Thus, the court rejected the assertion that

regulation of waste-disposal facilities under R.C. Chapter 3734 alone qualified this sanitary landfill as a matter of public concern.

{¶ 66} We find that the instant case is distinguishable from *A & B Refuse Disposers*. An SWMD is a unique government-run entity charged with the creation and implementation of a solid-waste-management plan applicable to the entire county that will provide for the disposal of all solid waste produced by the county for at least ten years. Moreover, an SWMD has the authority to levy fees on the generation of all solid waste created in the district, as well as for the disposal of *all* solid waste at a facility located in the district. R.C. 3734.573 and 3734.57(B)(1) through (3). These rates must be paid "by *every* person, municipal corporation, township, or other political subdivision that owns premises to which solid waste collection, storage, transfer, disposal, recycling, processing, or re-source recovery service is provided by the district and may change the rates or charges whenever it considers it advisable." (Emphasis added.) R.C. 343.08(A). These rates are set considering the cost of service rather than based solely on market conditions. Finally, an SWMD has authority to issue rules that govern the "maintenance, protection, and use of solid waste collection, storage, disposal, transfer, recycling, processing, and resource recovery facilities within the district and requiring the submission of general plans and specifications for the construc-tion, enlargement, or modification of any such facility." R.C. 3734.53(C)(2).

{¶ 67} Thus, the nature of the regulation by R.C. Chapter 3734 (i.e., to protect persons and the environment) does not qualify an SWMD as a matter of public concern. Rather, it is the SWMD's unique position of control over the manage-ment and disposal of a district's solid waste and ability to set fees for the generation and disposal of solid waste within the district that qualify it as a matter of public concern. Therefore, we find that the district qualifies as a matter of public concern.

{¶ 68} In sum, where an entity "serves such a substantial part of the public that its rates, charges and methods of operation become a public concern, it can be characterized as a public utility." *A & B Refuse Disposers,* 64 Ohio St.3d at 388, 596 N.E.2d 423. Because the district possesses these attributes, we hold that the district is a public utility as that term is used in R.C. 5705.44.

2. Payment of Monitoring Expenses

{¶ 69} Pursuant to R.C. 5705.44, only payments from the *earnings* of a public utility are excepted from the certification requirement of R.C. 5705.41(D). As we found earlier, the district levied and collected fees on the generation and the disposal of solid waste in the district that were used at least in part to finance the environmental monitoring. The district maintained and administered a fund to pay monitoring costs that was financed at least in part by its surcharge. Accordingly, the agreement herein is not void for lack of certification under R.C.

5705.41(D), because the money spent by the district to monitor the landfill came from revenue earned by a public utility.

## IV. Conclusion

{¶ 70} We hold (1) that the agreement requires the county to pay for monitoring beyond the term of the agreement, (2) that the city did not breach the agreement, and (3) that the agreement is not void for lack of certification under R.C. 5705.41(D). Accordingly, we affirm the judgment of the court of appeals.

Judgment affirmed.

MOYER, C.J., and PFEIFER and O'CONNOR, JJ., concur.

O'DONNELL and LANZINGER, JJ., dissent.

CUPP, J., dissents and would dismiss the appeal as having been improvidently accepted.

---

**O'DONNELL, J., dissenting.**

{¶ 71} The matter before our court involves a breach-of-contract action between Auglaize County and the city of St. Marys in a dispute regarding an agreement for the disposal of solid waste. Although interesting, the case involves neither a novel legal issue nor a substantial constitutional question or an issue of public or great general interest. The issue in this case is whether the landfill agreement requires the county to pay for any postclosure costs despite the termination of the agreement.

{¶ 72} In response to a motion for reconsideration, this court also accepted a fourth proposition of law concerning the county's obligation to pay the municipality pursuant to the contract when the auditor never certified funds according to R.C. 5705.41(D), an issue never passed upon or mentioned by the court of appeals.

{¶ 73} In my view, this case should be dismissed as having been improvidently accepted, as it fails to present a substantial constitutional issue or an issue of public or great general interest. This court ought not rule on matters not ruled on by appellate courts.

LANZINGER, J., concurs in the foregoing opinion.

---

Vorys, Sater, Seymour & Pease, L.L.P., Bruce Ingram, and Philip F. Downey; and Noble, Montague & Moul and Kraig E. Noble, for appellee.

Eastman & Smith Ltd., Henry N. Heuerman, and Albin Bauer III; and Edwin A. Pierce, Auglaize County Prosecuting Attorney, for appellant.

Byron & Byron Co., L.P.A., and Stephen L. Byron, urging affirmance for amicus curiae, Ohio Municipal League.