CITY OF ENGLEWOOD, Appellant,

v.

MIAMI VALLEY LIGHTING, L.L.C., d.b.a. DPL Energy, Appellee.

[Cite as Englewood v. Miami Valley Lighting, L.L.C.,
182 Ohio App.3d 58, 2009-Ohio-1631.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 22965.

Decided April 3, 2009.

60

Michael P. McNamee and Gregory B. O'Connor, for appellant.

Jeffrey S. Sharkey and John A. Fischer, for appellee.

WOLFF, Judge.

{¶ 1} The city of Englewood appeals from a judgment of the Montgomery County Court of Common Pleas, which held, after a hearing, that the city lacked the power to appropriate Miami Valley Lighting's street-lighting system, pursuant to Section 4, Article XVIII of the Ohio Constitution, R.C. 719.01(K), or the city's home-rule powers. For the following reasons, the trial court's judgment will be affirmed.

I

{¶ 2} For many years, the city of Englewood has contracted with Miami Valley Lighting, L.L.C. ("MVL"), a wholly-owned subsidiary of DPL, Inc., for MVL to provide "full service" street lighting. This "full service" includes designing, constructing, maintaining, and energizing street lights for the municipality. MVL owns 1,212 street-lights within the city of Englewood. All of these street-lights are located in the public right-of-way. Englewood also owns approximately 300 street-lights; the city had these lights installed, and it provides its own maintenance for these lights. All of the street-lights receive electricity from Dayton Power & Light ("DP & L").

{¶ 3} In early 2004, Englewood hired MK Pope Engineering Company, a sole proprietorship established by Michael Pope, to work on street-lighting projects within the city. Englewood also asked MK Pope to prepare an analysis of the existing street lighting owned by MVL to determine the operating cost for the city if it were to own the system itself, compared to the cost to Englewood under its contract with MVL. Pope concluded that the city could save $117,568.43 per year if it owned and maintained the system.

{¶ 4} In anticipation of purchasing or appropriating MVL's street-lighting system and operating it as a public utility, on May 24, 2005, the Englewood City Council passed Resolution 05–10, which formally declared the city to be a public-utility provider. On March 6, 2006, the city, through its Law Director, informed MVL that it would not be renewing its existing contract with MVL. The contract was scheduled to terminate on December 31, 2006.

{¶ 5} In June 2006, SAI Group performed a "personal property appraisal" of the street-lighting system in Englewood for the city. The property consisted of 1,212 street-lights, which fell into four general lighting types: (1) Type A: "A street light and arm mounted on a wood utility pole and used exclusively for street lighting only absent of any related DP & L electrical utility usage," (2) Type B: "A street light and arm mounted on a wood utility pole that also included other electrical uses by DP & L," (3) Type C: "A street light and arm mounted on a steel or aluminum pole and used exclusively for street lighting absent any related DP & L electrical utility usage," and (4) Type D: "A post top street light mounted on a fiberglass pole used and used exclusively for street lighting only absent of any related DP & L electrical utility usage." MVL had 375 Type A, 188 Type B, 614 Type C, and 35 Type D street-lights in Englewood. SAI Group valued MVL's street-lighting property at $210,000.

{¶ 6} On June 27, 2006, the Englewood City Council passed Resolution 20–06, declaring a necessity and the city's intent to appropriate MVL's existing street-lighting system, located within the city's right-of-way, as a public utility and a component of the city electric system. The resolution provided that "the purpose of this appropriation is to provide electric street lighting services to the city's inhabitants through the city's public utility as well as to promote and protect health, safety and public welfare." Englewood provided a copy of the resolution to MVL.

{¶ 7} After the resolution was passed, Englewood began negotiations with MVL to try to purchase MVL's street-lighting system within the city. MVL was not interested in selling its street-lights. Consequently, in September 2006, the Englewood City Council passed Ordinance 06–10, which "authorized and directed [the City Manager and Law Director] to perform all acts necessary to acquire the above-mentioned Street Lighting System on behalf of the City of Englewood."

{¶ 8} On November 13, 2006, Englewood filed a "complaint for appropriation of property" in the common pleas court, seeking to appropriate the fee-simple-absolute interest in the street-lighting system in accordance with the Charter of the City of Englewood; Section 4, Article XVIII of the Ohio Constitution; and R.C. Chapters 163 and 719. MVL contested Englewood's complaint, asserting that street lighting is not a public utility and that its street-lights are personal, not real, property.

{¶ 9} In June 2007, the trial court scheduled a hearing on "necessity," pursuant to R.C. 163.09(B), which, at the time that this action was filed, provided:

{¶ 10} "When an answer [to the appropriation petition] is filed pursuant to section 163.08 of the Revised Code and any of the matters relating to the right to make the appropriation, the inability of the parties to agree, or the necessity for the appropriation are specifically denied in the manner provided in that section, the court shall set a day, not less than five or more than fifteen days from the date the answer was filed, to hear those matters. Upon those matters, the burden of proof is upon the owner. A resolution or ordinance of the governing or controlling body, council, or board of the agency declaring the necessity for the appropriation shall be prima-facie evidence of that necessity in the absence of proof showing an abuse of discretion by the agency in determining that necessity."[1]

{¶ 11} The trial court held the required hearing on October 10 and 11, 2007. Both parties agreed that the issues before the court were (1) whether Englewood had the right to appropriate the street-lights and (2) whether the appropriation was necessary. The parties further agreed that Englewood sought to appropriate the street-lights under two separate authorities: R.C. 719.01(K) and Section 4, Article XVIII of the Ohio Constitution. A large portion of the testimony related to the question of whether a street-lighting system is a "public utility."

{¶ 12} On September 25, 2008, the trial court held that Englewood lacked the power to appropriate MVL's street-lighting system. Beginning with Englewood's authority under the Ohio Constitution, the court initially concluded that *Norwood v. Horney*, 110 Ohio St.3d 353, 853 N.E.2d 1115, did not bar Englewood's acquisition of the property, because the city intended to put the property to

---

1. {¶ a} R.C. 163.09(B) has since been amended. The portion relating to the burden of proof now reads:

 {¶ b} "(1) * * * Upon those matters, the burden of proof is upon the agency by a preponderance of the evidence except as follows:

 {¶ c} "(a) A resolution or ordinance of the governing or controlling body, council, or board of the agency declaring the necessity for the appropriation creates a rebuttable presumption of the necessity for the appropriation if the agency is not appropriating the property because it is a blighted parcel or part of a blighted area or slum."

municipal, rather than private, use. However, the court determined that the city had no authority to appropriate the street-lighting system under Section 4, Article XVIII because the system was not a public utility. Based on this determination, the trial court did not address whether appropriation was necessary. The court further held that Englewood could not appropriate the street-lights under R.C. 719.01(K), because the street-lighting equipment was not a fixture on real estate. Finally, the court rejected Englewood's assertion that it could appropriate the property under its home-rule powers in Section 3, Article XVIII of the Ohio Constitution. The trial court thus concluded that Englewood's "motions to acquire [MVL's property] must fail."

{¶ 13} The city of Englewood appeals, raising four assignments of error.

## II

{¶ 14} Englewood's first assignment of error states:

{¶ 15} "The trial court erred by holding that the system is not a public utility."

{¶ 16} Section 4, Article XVIII of the Ohio Constitution provides:

{¶ 17} "Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the products or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service. The acquisition of any such public utility may be by condemnation or otherwise, and a municipality may acquire thereby the use of, or full title to, the property and franchise of any company or person supplying to the municipality or its inhabitants the service or produce of any such utility."

{¶ 18} The Ohio Constitution does not define "public utility" for purposes of Section 4, Article XVIII. Although "public utility" is defined in certain titles of the Revised Code, the Ohio Supreme Court has held that those definitions are relevant solely to the statutory chapters in which they are located and thus are irrelevant in defining "public utility" in other contexts. *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, ¶ 53. Where the statute or constitutional provision does not provide a definition, courts should look to case law. Id.

{¶ 19} "Determination of whether a particular entity is a public utility is a mixed question of law and fact. The resolution of the question of whether an enterprise is operating as a public utility is decided by an examination of the nature of the business in which it is engaged. Although case law provides a list of characteristics common to public utilities, it is generally recognized that none of these characteristics is controlling. That is, each case must be decided on the facts and circumstances peculiar to it." (Citations omitted.) *A & B Refuse*

*Disposers, Inc. v. Ravenna Twp. Bd. of Trustees* (1992), 64 Ohio St.3d 385, 387, 596 N.E.2d 423.

{¶ 20} The Supreme Court has considered numerous factors in determining whether a good or service qualifies as a public utility. First, a public utility provides "an essential good or service to the general public which has a legal right to demand or receive this good or service." Id. at 387, 596 N.E.2d 423. Second, the good or service must be provided " 'generally and indiscriminately.' " *St. Marys* at ¶ 57, quoting *S. Ohio Power Co. v. Pub. Util. Comm.* (1924), 110 Ohio St. 246, 143 N.E. 700, paragraph two of the syllabus. The provider must have an obligation to provide the good or service that cannot be arbitrarily or unreasonably withdrawn. *A & B Refuse Disposers* at 387, 596 N.E.2d 423. Together, these factors have been referred to as the "public service" requirement.

{¶ 21} Next, a public utility must conduct "its operations in such a manner as to be a matter of public concern." *A & B Refuse Disposers*, 64 Ohio St.3d at 388, 596 N.E.2d 423. In evaluating whether an entity conducts itself in a manner as to be a public concern, courts consider (1) the good or service provided, (2) competition in the local marketplace, and (3) regulation by a governmental authority. Id.

{¶ 22} Applying these factors, the trial court concluded that MVL's street-lighting system was not a public utility. As to the "public service" factors, the trial court found that street lighting is not generally and indiscriminately used by the public, noting that there are many streets throughout the Miami Valley and in Englewood itself that do not have street lighting. (Englewood disputes the trial court's finding that many streets in the city lack street-lights.) The court further found that the public does not have the right to demand street lighting and that MVL "is not obligated to provide street lighting whenever and wherever requested." The court noted that witnesses for each party stated that street lighting is not an essential service. The court concluded that "the section of the public that Englewood claims is entitled to the street lighting is not definable by a geographic area" as not all of Englewood's streets have street lighting.

{¶ 23} Turning to the "public concern" factors, the trial court concluded that street lighting was not an "essential service." The court reasoned: "Residents of Englewood and elsewhere are not dependent on street lighting as they are on say electricity in their homes." The court further found that MVL did not have a monopoly and that competition existed in the area. The court stated:

{¶ 24} "Components for the street lighting system can be bought from several different manufacturers. Englewood could employ another company to install the street-light or could install the lights itself. Likewise Englewood could hire

other companies to maintain the street lighting or it could perform its own maintenance. Englewood could have procured the electricity for the street-lights from DP & L directly. Englewood already owns over 300 street-lights. Finally, there is no regulation of street lighting by a government authority.

{¶ 25} "The street lighting system lacks both core characteristics necessary to be declared a public utility."

{¶ 26} Although Englewood acknowledges that the trial court employed the correct factors for determining whether street lighting is a public utility, the city claims on appeal that the trial court erred in its application of the factors. Upon review, we find no fault with the trial court's conclusion that MVL's street-lighting system in Englewood is not a public utility.

{¶ 27} Upon review of the evidence, we likewise find that street lighting has few characteristics that would qualify it as a public utility. Beginning with the "public service" factors, Englewood asserts that the trial court incorrectly applied an "essential to survival" standard in concluding that street lighting is not an "essential service." Although courts have not required that a public utility be "essential to survival," courts have construed essential services to be akin to those services provided by traditional public utilities, such as electricity, gas, solid waste disposal, and telecommunication services. See *Washington Twp. Trustees v. Davis*, 95 Ohio St.3d 274, 2002-Ohio-2123, 767 N.E.2d 261, ¶ 22; *St. Marys*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561. An essential service is one that society has deemed "necessary." *St. Marys* at ¶ 60. Compare *Davis* at ¶ 22 (radio broadcasting is not an essential service).

{¶ 28} Initially, we note that witnesses for both parties agree that street-lights enhance safety for pedestrian and vehicular traffic. Street-lights provide personal security for individuals on streets and sidewalks, they deter crime, and they allow motorists to see objects on the road more clearly. Moreover, the presence of street lighting encourages commercial transactions to continue after dark and may be aesthetically pleasing.

{¶ 29} Although street lighting is undoubtedly beneficial to the public, we agree with the trial court that street lighting is not an "essential service." As stated by Englewood's expert, Michael Pope, there is no state law requiring street lighting on all streets, and the decision to create a street-lighting system is made by individual communities, which weigh the costs of street lighting against the benefits to the community. Joyce Reives, Director of MVL, testified that less than half of streets in the Miami Valley have street lighting, and Pope likewise testified that many streets in southern Ohio do not have street-lights. Although Englewood has street lighting on all of its streets, the extent of street lighting was determined by the city in the exercise of its discretion. In short, the fact that Englewood has street lighting throughout the city was a policy choice, not a

necessity. As stated in *Elwing v. Columbus* (July 17, 1997), Franklin App. No. 96APE10–1424, 1997 WL 401949:

{¶ 30} "Whether a municipality decides to provide street lighting and where the street lights are placed is discretionary with the municipality. Unlike traffic signals or signage, the provision of street lighting does not directly affect the flow of ordinary traffic on a roadway. Roadways still are safe for travel without lighting or with less lighting than may be required to illuminate the entire area."

 {¶ 31} Street lighting is available to the public indiscriminately in the sense that Englewood has provided street lighting throughout the city and anyone who uses a street within Englewood may enjoy the benefits of the illumination. However, the fact that services are "open to the public" does not, by itself, render the service a public utility. *A & B Refuse*, 64 Ohio St.3d at 389, 596 N.E.2d 423 (discussing *Marano v. Gibbs* (1989), 45 Ohio St.3d 310, 544 N.E.2d 635); *Castle Aviation, Inc. v. Wilkins*, 109 Ohio St.3d 290, 2006-Ohio-2420, 847 N.E.2d 420, ¶ 29.

{¶ 32} Significantly, there is no evidence that the public has a legal right to demand or to receive street-lights from MVL. Englewood's City Manager, Eric Smith, acknowledged that Englewood has no written policy that street-lights be installed on commercial streets. Although Englewood requires developers of subdivisions to install street-lights, there is no evidence that the public has any right to demand that a street-light be placed on any particular street or at any particular location on a street. More important, the nature of MVL's business is not one that creates an obligation to MVL to provide its services indiscriminately to any municipality or entity within its service area. Compare *Ohio Power Co. v. Attica* (1970), 23 Ohio St.2d 37, 43, 52 O.O.2d 90, 261 N.E.2d 123.

{¶ 33} Turning to the "public concern" factors, Englewood claims that the trial court erred in concluding that MVL does not have a monopoly on street lighting and in accepting MVL's "pieces and parts" theory. Englewood argues: "[MVL's] monopoly on street lighting in the only geographic area relevant to this case, Englewood, Ohio, is undeniable. Their system covers more than 98% of the City, and is used by everyone living in, visiting, or even passing through." Englewood claims that the "pieces and parts" theory is "blind to reality" and based on "theoretical competition."

 {¶ 34} "A monopoly in general means the concentration of business in the hands of a few, or a combination for the purpose of raising or controlling prices." *List v. Burley Tobacco Growers' Co-op. Assn.* (1926), 114 Ohio St. 361, 382, 151 N.E. 471.

{¶ 35} According to the testimony, MVL provides "full service" street-lighting services to approximately 160 municipalities and about 2,000 outdoor flood lights

to commercial customers. MVL's "full service" includes designing the street-lighting system, obtaining materials, constructing the street-lights, connecting them to electricity supplied by DP & L, and maintaining the street-lights. MVL provides these services through a negotiated contract with the municipality. It is undisputed that MVL is the only company in the area that provides "full service" street-lighting services.

{¶ 36} According to Reives, MVL does not manufacture street-lighting equipment. MVL obtains the parts from a number of suppliers, primarily General Electric. MVL also "outsources" the installation of the street-lights. Reives indicated that MVL has three primary contractors that it hires to install the lights. If a pole requires maintenance, MVL obtains information from the customer and contacts a contractor to perform the required maintenance work. MVL pays DP & L for electricity, like any other consumer.

{¶ 37} Reives testified that MVL's "strongest competitors" are the municipalities. She explained: "We are a service company and all of the pieces and parts that we perform could be performed by other entities. It is truly a competitive service and could be performed by other entities."

{¶ 38} The parties agree that MVL owns 1,212 street-lights and that Englewood itself owns 300 street-lights in the city. Reives testified that Englewood has the same choices that MVL has regarding the materials, installation, electric service, and maintenance of the street-lights in the city. Pope likewise stated that many contractors can install and maintain street-lighting equipment, and that the city could (1) contract with MVL for full-service street lighting, (2) install street-lights itself, or (3) hire a contractor to install and maintain its street-lights. Smith also acknowledged that Englewood can buy the components from a variety of manufacturers. Smith indicated that Englewood can and has hired contractors and that it can and has maintained street-lights itself.

{¶ 39} Based on the record, the unique nature of MVL's business is that it provides "one stop shopping" for municipalities and other businesses that wish to install and maintain exterior lighting. In essence, MVL's services are akin to those of a general contractor, who arranges for the acquisition and installation of materials from subcontractors for its client. While MVL is the only provider of "full service" street lighting—i.e., it is the only private company that will obtain the materials, install the street-lights, and provide maintenance for the lights—it does not have a monopoly on the availability of street-lights, installation services, or maintenance services. Moreover, many municipalities, including Englewood, have "been their own general contractor" and arranged for the purchase, installation, and maintenance of street-lights themselves. Although 80 percent (1,212 out of approximately 1,500) of Englewood's street-lights are owned by MVL, MVL's dominance in Englewood is due to Englewood's prior decisions to

contract with MVL rather than to purchase its own street-lights, which it has now begun to do.

{¶ 40} Englewood further claims that street lighting is heavily regulated, thus rendering it a public concern. Smith testified that developers are required to install street-lights in all new subdivisions, and that Englewood has an unwritten policy of requiring street-lights on all streets in the city. MVL provided evidence that the Public Utility Commission of Ohio ("PUCO") has determined that street lighting is not a public utility.

{¶ 41} Not all governmental regulation supports the finding that the regulated entity is a public utility. For example, regulation by the Federal Communications Commission, *Davis*; by the Federal Aviation Administration, *Castle Aviation*; and environmental regulation under R.C. Chapter 3734, *A & B Refuse*, have been rejected as regulation indicative of a public utility. As stated in *Castle Aviation*:

{¶ 42} "Castle's operations are similar to many other private business operations in that they must comply with various regulations, e.g., safety or environmental regulations, in order for the business to operate; however, those regulations do not control the relation between the business and the public as its customers." Id., 109 Ohio St.3d 290, 2006-Ohio-2420, 847 N.E.2d 420, at ¶ 29.

{¶ 43} Although regulation by PUCO is neither required nor dispositive of whether an entity is a public utility, the basis and nature of the regulation should "parallel [those] of businesses ordinarily accepted as public utilities." *Davis*, 95 Ohio St.3d 274, 2002-Ohio-2123, 767 N.E.2d 261, at ¶ 21, quoting *Mammina v. Cortlandt Zoning Bd. of Appeals* (1981), 110 Misc.2d 534, 537, 442 N.Y.S.2d 689.

{¶ 44} In *St. Marys*, it was the county's solid-waste-management district's "unique position of control over the management and disposal of a district's solid waste and ability to set fees for the generation and disposal of solid waste within the district that qualify it as a matter of public concern." 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, ¶ 67.

{¶ 45} As stated above, street-lights are required to be installed in all new subdivisions in Englewood, and Englewood has an unwritten policy of providing street lighting on all city streets. Although street lighting is subject to regulation by Englewood, it is not regulated in the same manner as a public utility. Although the Ohio Revised Code contains provisions regulating "electric light companies," these provisions appear to relate to companies that produce and distribute electricity for electric lighting, not to companies that manufacture or install street-lights. See, e.g., R.C. 4905.03(A)(4); 4928.01(A)(7).

{¶ 46} The characteristics of MVL's provision of street lighting to Englewood do not support the conclusion that MVL's services are a matter of public concern.

{¶ 47} Englewood's first assignment of error is overruled.

### III

{¶ 48} Englewood's second assignment of error states:

{¶ 49} "The trial court erred by holding that Englewood does not have the power to declare the system to be a public utility."

{¶ 50} In its second assignment of error, Englewood claims that the trial court erred in determining that the city could not use its home-rule powers under Sections 3 and 7, Article XVIII of the Ohio Constitution to declare that MVL's street-lighting system is a public utility. The city relies on *Vernon v. Warner Amex Cable Communications, Inc.* (1986), 25 Ohio St.3d 117, 25 OBR 164, 495 N.E.2d 374.

{¶ 51} Sections 3 and 7, Article XVIII of the Ohio Constitution, the "home rule" provisions, provide:

{¶ 52} "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." (Section 3)

{¶ 53} "Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government." (Section 7)

{¶ 54} In *Vernon*, the Supreme Court addressed whether the city of Akron exceeded its home-rule authority when it declared community antenna television ("CATV"), more commonly referred to as cable television, to be a public utility. In that case, Akron enacted two ordinances governing CATV. The first ordinance declared CATV to be a public utility when operated within the city; the second ordinance required those wishing to operate a CATV system within the city to obtain a franchise pursuant to the city charter provisions as they related to public-utility franchises. Warner Amex obtained a franchise and placed a grey metal box in the right of way on properties within the city. The Vernons challenged the placement of that box on their property, claiming that the city had exceeded its power in declaring CATV to be a public utility.

{¶ 55} The Supreme Court noted that the issue was not whether CATV is a public utility in the traditional or statutory sense. Id., 25 Ohio St.3d at 119, 25 OBR 164, 495 N.E.2d 374. Rather, the question was "whether a municipality may authorize and characterize a CATV as a public utility within its environs, in a

manner consistent with its home rule and police powers." The court concluded that "the city possesses the ability to designate CATVs as a public utility, since such designation does not run afoul of the city's charter or the general laws of the state." Id.

{¶ 56} In reaching this conclusion, the Supreme Court initially noted that "public utility" was not defined by the Akron City Charter or ordinances, and that the definition was not limited to those set forth in the Revised Code. The court further declined to follow its common-law definition of "public utility" set forth in *S. Ohio Power Co. v. Pub. Util. Comm.* (1924), 110 Ohio St. 246, 143 N.E. 700, acknowledging that CATVs are not public utilities but "could be reasonably classified as something analogous to traditional public utilities." Id. at 120, 25 OBR 164, 495 N.E.2d 374.

{¶ 57} The court then focused on whether Akron's authorization and regulation of CATVs was consistent with its home-rule and police powers. The Supreme Court noted that the regulation of the use of publicly owned or controlled property fell squarely within the city's police powers, and that Warner Amex's metal boxes were placed within the public right of way. It further stated that, because the Ohio Revised Code did not set forth the exclusive definition of "public utility," Akron's ordinances did not conflict with the general laws of the state. The court then concluded that the city's designation of CATV as a "public utility" was a proper exercise of the city's home-rule and police powers. It reasoned:

{¶ 58} "[T]he inclusion of CATV systems within the meaning of the phrase 'public utility' is a logical one, because in the development and operation of a CATV's own distribution network, it is very much like the more traditional public utilities and begs for the same regulation to ensure that the system of cables, wires, and poles is erected and maintained in a safe and efficient way. * * * It is within a municipality's power to protect the public health and welfare regulating the establishment and maintenance of a CATV's distribution network." Id. at 121, 25 OBR 164, 495 N.E.2d 374.

{¶ 59} The trial court in this case distinguished *Vernon,* stating:

{¶ 60} "Englewood is not attempting to regulate the street lighting system. Englewood wants to appropriate the street lighting system.

{¶ 61} "Adopting Englewood's interpretation of *Vernon* would seem to allow a city to declare any item of property as a public utility which would in turn give the city the ability to appropriate that property. Such an interpretation is an abuse of a city's home rule powers. Englewood's act of simply declaring the street lighting system to be a public utility does not give Englewood the power to appropriate the property."

{¶ 62} Englewood argues that the distinction between declaring a system to be a public utility to regulate it and declaring a system to be a public utility to appropriate it is immaterial. The city argues that both purposes "advance legitimate public health, safety, and welfare goals" and thus *Vernon* applies to this case. MVL responds that *Vernon* is inapplicable because it "did not involve a municipality purporting to interpret the Ohio Constitution and the scope of its eminent domain powers" and, regardless, *Vernon* was overruled by *Norwood v. Horney,* 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115.

{¶ 63} We agree with the trial court that *Vernon* is distinguishable from the situation before us. As noted by the trial court, *Vernon* was concerned with the city's ability to regulate its public right of way, not with its right to appropriate the alleged public utility. Significantly, the Supreme Court found that the cable television was reasonably akin to a public utility under the circumstances because "the system of cables, wires, and poles" was similar to those of traditional public utilities. *Vernon,* 25 Ohio St.3d at 121, 25 OBR 164, 495 N.E.2d 374. That is not the case here. Although electric street-lights must get electricity from DP & L, street-lights are separate from the electric distribution system. As stated by Robert Stallman, manager of government relations for DP & L, the provision of electricity to street lighting "is similar to service received by the grocery, the shoe store, the restaurant in that it comes from the electric-distribution lines of the utility." In short, we do not find CATV to be analogous to street lighting, nor do we find designating a service as a public utility for appropriation purposes to be analogous to making such a designation for purposes of regulating a municipality's right of way. In our view, *Vernon* is not applicable to this case.

{¶ 64} The second assignment of error is overruled.

IV

{¶ 65} Englewood's third assignment of error states:

{¶ 66} "The trial court erred by holding that the system is not a fixture to the real property that it sits on."

{¶ 67} In its third assignment of error, Englewood claims that the trial court erred in determining that MVL's street-lights were not fixtures to real property and, thus, not subject to appropriation under R.C. 719.01(K).

{¶ 68} R.C. 719.01(K) provides that "[a]ny municipal corporation may appropriate, enter upon, and hold *real estate* within its corporate limits * * * [f]or natural and artificial gas, electric lighting, heating, and power plants, and for supplying the product thereof." (Emphasis added.)

{¶ 69} "A fixture is something which is affixed to the realty so as to become a part of it." *In re Gruesbeck* (Mar. 27, 1998), Greene App. No. 97–CA–

59, 1998 WL 404516. If personal property becomes a fixture to real property, it may be appropriated by the government. However, if, upon being affixed to realty, the property continues to be personal property, it may not be included in property taken by the government, and it is not compensable in an appropriation action.

{¶ 70} In determining whether an item is a fixture to real property for purposes of an appropriation proceeding, courts must consider "the particular facts of each case, taking into account such facts as the nature of the property; the manner in which it is annexed to the realty; the purpose for which the annexation is made; the intention * * * to make [it] part of the realty; the degree of difficulty * * * involved in removing the property * * *; and the damage to the severed property which such removal would cause." *Masheter v. Boehm* (1974), 37 Ohio St.2d 68, 66 O.O.2d 183, 307 N.E.2d 533, at paragraph two of the syllabus.

{¶ 71} The application of these factors in an appropriation proceeding differs from how these factors might be applied in other contexts. As described by the Supreme Court:

{¶ 72} "The factor of physical annexation of personal property to the realty has come to be regarded as less determinative of fixture status than was formerly the case at common law. * * * Thus, a chattel may be considered a fixture even though only slightly attached to the realty * * *, or though only constructively attached, but will not necessarily be considered a fixture because of a high degree of attachment to the realty unless the other criteria are met.

{¶ 73} "Of more importance in determining whether personal property has become a fixture is the intention of the party responsible for emplacing the item, and the use or purpose to which it is put. * * *

{¶ 74} " 'The general principle to be kept in view in determining whether what once was a chattel has become a fixture is the distinction between the business which is carried on in or upon the premises, and the premises. The former is personal in its nature, and articles that are merely accessory to the business, and have been put upon the premises for this purpose, and not as accessions to the real estate, retain the personal character of the principal to which they belong and are subservient. But articles which have been annexed to the premises as accessory to it, whatever business may be carried on upon it, and not peculiarly for the benefit of a present business which may be of a temporary duration, become subservient to the realty and acquire and retain its legal character. * * *' " [*Zangerle v. Republic Steel Corp.* (1945), 144 Ohio St. 529, 30 O.O. 160, 60 N.E.2d 170, paragraph seven of the syllabus.]

{¶ 75} "The necessary corollary to that principle is that articles annexed to the premises so as to become a part of it, even though of benefit to any and all businesses which might be carried on there, take on the legal characteristics of real property.

{¶ 76} "However, even in business fixture cases it is generally held that the intention of the annexing party is of primary importance. The intention to annex personal property so that it becomes a part of the realty, or the contrary, may be manifested in a contract, by the annexer's dealings with the annexed property, or otherwise. Although there need be no formal declaration of intent by the annexer, it is generally held that the intent to have annexed property be considered as a part of the realty must be accompanied by some positive act or course of action clearly demonstrating the intent before the result will be as the annexer intended.

{¶ 77} "The requirement of a showing of intent applies differently in appropriation cases than in other situations. Although the relationship between the parties in appropriation cases is that of buyer and seller, as Justice Cardozo stated in *Jackson v. State* (1914), 213 N.Y. 34, 106 N.E. 758, they are not on the same footing as a willing buyer and a willing seller in a free market. Because there is no intent to buy or sell prior to the beginning of an appropriation proceeding, and no consideration has been given as to what other property would pass with the land, the law must apply the intention of the party who annexed personal property to the land." (Citations omitted.) *Masheter*, 37 Ohio St.2d at 73–75, 66 O.O.2d 183, 307 N.E.2d 533.

{¶ 78} In an appropriation proceeding, the determination of whether an item is a fixture is a question of law. Id. at paragraph three of the syllabus.

{¶ 79} In this case, the trial court concluded that the street-lights that MVL installed in Englewood were not fixtures. The court noted that the lighting system is composed of poles, mast arms, luminaries, and wires, and that the manner of attaching the poles to real property depended on the type of pole. Englewood argued that removing the lights would take a substantial period of time and expense, while MVL asserted that the removal would be easy and inexpensive and would cause minimal damage to the property. Focusing on MVL's intent, the trial court found that MVL intended to remove the street-lights upon the termination of a contract and that they did not intend for the property to become a fixture. The trial court thus held that the street-lights were not real property and that Englewood could not appropriate them under R.C. 719.01(K).

{¶ 80} On appeal, Englewood asserts that the trial court should have considered the lighting system as a whole and given greater weight to the fact that the

street-lights are affixed such that they should "stay for a long time." The city further argues that the street-lights benefit the property to which it is attached and that, prior to this litigation, MVL and Englewood "envisioned a permanently attached system." Englewood maintains that removal of the street-lighting system would cause material damage to the land, causing 1,246 holes, each six to eight feet deep, that would need to be filled in and reseeded.

{¶ 81} In support of its assertion that the street-lighting system is a fixture, Englewood relies upon *Parkbrook Golf Corp. v. Donahue* (1966), 6 Ohio St.2d 198, 35 O.O.2d 311, 217 N.E.2d 211. In *Parkbrook*, the Supreme Court of Ohio affirmed a decision of the Board of Tax Appeals, which determined that a miniature-golf course, the golf course's watering system and electrical system for lighting, and a high fence with a sign affixed on it were all taxable as real property, even though the property "was of a personal nature."

{¶ 82} We find *Parkbrook* to be of little relevance to the issue before us. *Parkbrook* concerned a question of statutory construction regarding the definition of real property for taxation purposes under R.C. 5701.02. As recognized by the Supreme Court of Ohio, the statutory definition of real property under R.C. 5701.02 "deviates from the traditional common-law distinction between realty and personalty." *Green Circle Growers, Inc. v. Lorain Cty. Bd. of Revision* (1988), 35 Ohio St.3d 38, 39, 517 N.E.2d 899. (Parenthetically, Reives testified that MVL pays personal property taxes on all of its equipment in Englewood, including its poles, mast arms, luminaries, lamps, and wires.)

{¶ 83} Turning to the factors set forth in *Masheter*, we agree with the trial court's determination that the street-lights are not fixtures for purposes of Englewood's appropriation action.

{¶ 84} The street-lighting system is a collection of 1,212 street-lights, each of which consists of a pole, mast arm, luminary, and wires. Approximately 550 of the lights are mounted on metal poles; 350 of the lights are attached to wood poles. The balance are attached to utilities poles owned by DP & L; MVL has an attachment agreement with DP & L, and it pays a fee to DP & L for the lights installed on DP & L's poles. Wood and fiberglass poles are placed into a hole approximately six feet deep, with the dirt backfilled around the pole to secure it. Metal poles are affixed to concrete or screw-top foundations; most metal poles are now installed with the screw anchor. The average age of the street-lights in Englewood is approximately 21 years. The manner in which the street-lights are installed indicates "a high degree of attachment" to the realty. However, as stated in *Masheter*, this factor has limited weight if other factors do not indicate that the street-lights were intended to be a fixture.

{¶ 85} Although the parties disagree about the degree of difficulty and length of time it would take to remove a street-light, it is apparent that the hole could easily be refilled and the ground reseeded.

{¶ 86} According to the evidence, the street-lights were installed by MVL on Englewood's streets, pursuant to a lease agreement, for the purpose of illuminating Englewood's streets. MVL retained ownership of the street-lights it installed. The trial court credited Reives's and Stallman's testimony that if Englewood's contract with MVL were not renewed, MVL's intent would be to remove the street-lights and to use them elsewhere. Stallman further testified that the contract allowed Englewood to ask MVL to permanently remove existing street lighting, that Englewood had made such requests, and that MVL complied with each of those requests. The contract further required Englewood to pay for the street-lights' removal upon termination of the contract.

{¶ 87} Based on the terms of the contract and the testimony, the evidence establishes that MVL did not intend for the street-lights to become fixtures to the real property. As stated by the trial court:

{¶ 88} "It makes little sense that a business entity would intend to simply leave valuable property, that can be used elsewhere, behind at the termination of a contract. It is much more logical to conclude that [MVL] intended their street lighting system to be provided as part of a service to Englewood only for so long as the parties contracted. Had it been [MVL's] intent all along that the street lighting equipment remain behind after the conclusion of the contract[,] what would be the purpose of the contract renewals for Englewood's point of view? Why wouldn't Englewood simply decline to renew the contract?"

{¶ 89} The trial court properly gave significant weight to MVL's intent, and it properly concluded that the street-lights were not fixtures to the real property.

{¶ 90} Englewood's third assignment of error is overruled.

V

{¶ 91} Englewood's fourth assignment of error states:

{¶ 92} "The trial court erred by not deciding whether the appropriation of the system by Englewood is necessary under former R.C. § 163.09(b)."

{¶ 93} In its fourth assignment of error, Englewood asserts that the trial court should have considered whether appropriation was necessary. This argument is premised on the city's assertion that the street-lighting system is a public utility. Because we agree with the trial court that the street-lighting system is not a

public utility, the trial court correctly determined that it did not need to resolve whether appropriation was necessary.

{¶ 94} The fourth assignment of error is overruled.

## VI

{¶ 95} Having overruled each of the assignments of error, the judgment of the trial court is affirmed.

Judgment affirmed.

Donovan, P.J., and Fain, J., concur.

William H. Wolff Jr., retired, of the Second Appellate District, sitting by assignment.