[Cite as *Wolf Creek Eng. & Contracting, Inc. v. Ohio Dept. of Transp.*, 2011-Ohio-1406.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

WOLF CREEK ENGINEERING AND CONTRACTING, INC.

    Plaintiff

    v.

OHIO DEPARTMENT OF TRANSPORTATION

    Defendant
    Case No. 2008-07934

Judge Joseph T. Clark
Magistrate  Lee Hogan

MAGISTRATE DECISION

{¶ 1}  Plaintiff, Wolf Creek Engineering and Contracting , Inc. (Wolf Creek), brought this action on behalf of its subcontractor, Youngstown Bridge & Iron, Inc. (YBI), against  defendant, Ohio Department of Transportation (ODOT).  In its complaint, plaintiff alleges that this action is an appeal of the denial by the Claims Board Hearing Panel of the claim for compensation sought by YBI for the cost of replacing bolt assemblies that ODOT found to have been over-tightened beyond contract specifications.  The issues of liability and damages were not bifurcated and the case proceeded to trial on both issues.

{¶ 2}  The parties stipulated that they entered into a contract with regard to a bridge project in Summit County, that YBI was plaintiff's subcontractor performing structural bolt replacement, that the specifications governing and applicable to this dispute include both "Specification 10509" and "Section 513 of the 2005 Construction and Material Specification [CMS] as to Structural Steel Members," and that the parties had completed the contractual dispute resolution process.  The parties further stipulated

that the "singular issue subject to trial" is whether plaintiff "complied with the project contract and satisfactorily performed its work" or whether plaintiff did not meet the contract such that plaintiff "was required, for no compensation, to remove and/or replace the bolt assemblies" or otherwise satisfy defendant that "replacement of bolt assemblies was not necessary." (Stipulation of Parties, as read into the record.)

{¶ 3} According to ODOT, the contract required YBI to perform four steps: 1) the bolt and nut were to be assembled to a snug-tight connection; 2) the position of the nut on the bolt was marked; 3) the nut was then rotated 1/3 of a turn; and 4) a torque wrench was applied to ensure a predetermined minimum tightness. Specification Section 513.20 states, in part, that bolts are "snug tight when an impact wrench begins to impact the nut." (Defendant's Exhibit A.) Once the ironworker tightens the nut on the bolt to the "snug-tight" position, he then performs the "match mark" process. According to the specification, "the wrench operator shall match-mark the outer face of the nut with the flush or protruding portion of the bolt using a crayon or paint. The engineer will use the match-marks to determine the relative rotation between the bolt and nut during final tightening using the turn-of-the-nut method." (Defendant's Exhibit A.) After the components of the assembly have been marked, the installer uses a torque wrench to tighten the nut by 1/3 of a turn, plus or minus 30 percent. The bolts used in the project were supplied by Wolf Creek.

{¶ 4} Martin DePerro testified that he is the owner of YBI and that although he was never at the job site during construction, in his stead he sent his foremen, either Kenneth Orf or Brian Filip, and that each of them had over ten years experience. On August 14, 2007, ODOT notified YBI's ironworkers that some of the bolts were being turned 3/4 turn after match marking rather than the 1/3 turn.[1] On August 15, 2007, ODOT determined that some of the bolt assemblies had failed in that the nuts were

---

[1]ODOT inspectors noted in their daily logs that some match marks exceeded the 1/3 turn and that the ironworkers were going too far. (Defendant's Exhibits J, K.)

stripped and these defective assemblies were marked for replacement. (Defendant's Exhibit K.) According to DePerro, YBI replaced approximately 18 bolts out of 1,000 and then tested the majority of the remaining bolts with the torque wrench in the presence of the ODOT inspector. After YBI had completed their portion of the work and left the project, ODOT notified Wolf Creek that it had concerns that the remaining bolts may have been over-tightened.

{¶ 5} In a letter dated August 28, 2007, ODOT stated that "[d]ue to the significant number of failed high strength bolts in splice #1 and numerous other match marked bolts which appear to have been tightened beyond the specified tolerance, it appears that bolts may have been over tensioned during the erection and detailing of the structural steel members. The concern is that this condition may result in premature failure of these assemblies. * * * In lieu of removal and replacement of these non-specification assemblies, submit for review and acceptance a proposal, prepared and signed by a registered professional engineer, to address this condition." (Plaintiff's Exhibit 28.)

{¶ 6} DePerro testified that the option of finding an engineer to guarantee the performance of the bolts was not feasible inasmuch as no engineer would certify such condition without having been present when the bolts were installed. Subsequently, YBI removed and replaced all of the bolts. During cross-examination, DePerro acknowledged that he had observed some bolts in place prior to their replacement and that he also saw that some had been tightened beyond the match mark specification contained in Section 513.20 of the contract. DePerro conceded that if the nuts had been turned in excess of 1/3 of a turn including tolerance, such condition would not be in compliance with the contract.

{¶ 7} Brian Filip testified that he is a union ironworker who has been employed by YBI for several years and that he was a foreman on this project until August 13, 2007. Filip identified David James as the ODOT engineer who inspected the bolt assembly operation. Filip attributed the differences in the match marks to the individual

techniques used by the various installers.  Filip testified that in response to ODOT's rejection of the work, YBI cut out and replaced all the bolts and that each replacement bolt assembly was measured to be in compliance with the 1/3-turn specification.[2]

{¶ 8}  Kenneth Orf testified that he has worked for YBI for over ten years and that he replaced Filip as the foreman on the project.  Orf testified that the usual approach for each bolt assembly project involved performing the "Skidmore test" first. He explained that for each size bolt used on the project, YBI took an average torque measurement for three random bolts and set the torque wrench accordingly.  Regarding match marks, Orf noted that they can differ if all the bolts were not snug-tightened at the same place.  Nonetheless, he acknowledged that all the match marks in one splice should be at the same place.  He admitted that ODOT inspectors notified him that some of the bolt assemblies were stripped but that such assemblies were replaced.  He testified that he did not learn of ODOT's concerns regarding the match marks until near the end of the job.  He recalled that some of the beams were spliced at night on the ground and other beams were spliced in place on the bridge.

{¶ 9}  Plaintiff presented the expert testimony of Alan Sheppard, a licensed engineer who had been employed for over 34 years with Bethlehem Steel Company. He stated that he has experience with bolt assembly and has supervised the same. Sheppard described how the nuts are placed on the bolts with an air or vacuum-powered tool and how the installer listens as the nut makes a "whirring" sound until it makes contact, then the sound changes to a "click" at each turn.  The click indicates an impact strike.  Sheppard opined that torquing a nut more than 1/3 of a turn does not cause harm as long as the bolt is not damaged and the threads are not stripped. Sheppard explained that if the nut is over-tightened a piece of the bolt may shatter. Thus, in his opinion, if the bolt does not fail, i.e., if the bolt does not evidence damage, it

---

[2]YBI decided to replace all the bolt assemblies "under the Force Account guidelines established in specification 109.05" after notifying ODOT of its intent to seek compensation via the "dispute resolution

is suitable for use and extending the degree of turn beyond 1/3 is not cause for rejection. In essence, Sheppard opined that if the bolt does not break and the threads of either the bolt or the nut are not stripped on installation, the bolt assembly is safe and does not create cause for rejection.

{¶ 10} Sheppard explained that the purpose of the match mark is to ensure that the installer completed the 1/3 turn and to provide a visual guide for inspection. Sheppard maintained that even if the bolts were not in compliance with the contract, there was no need to replace them if the bolts were not damaged.

{¶ 11} Defendant's expert, David James, testified that in 2007 he was the project manager for the replacement of the bridge structure above the pier caps, and that ODOT contracted with Wolf Creek as the single prime contractor on the project. According to James, the contract allowed ODOT to reject defective work, which was defined as work not within reasonable conformance to the contract specifications.[3] He recalled that bolt assemblies were found to be outside the specifications required by the contract, that some of the assemblies were damaged and that, as such, ODOT was concerned that the bolts had been over-tightened. James acknowledged that he learned that the match marks exceeded the specifications as early as August 15, 2007, but that the work was not rejected until August 28, 2007. Nonetheless, James testified that, according to section 105.10, failure of inspectors to detect every incidence of defective work does not obligate ODOT to accept the work if rejection occurs prior to final acceptance. He explained that final acceptance takes place when all the work on

and administrative claims process set forth in the proposals for this project." (Plaintiff's Exhibit 29.)

[3]Section 101.03 of the CMS states that "[r]easonably close conformity means compliance with reasonable and customary manufacturing and construction tolerances where working tolerances are not specified. Where working tolerances are specified, reasonably close conformity means compliance with such working tolerances. Without detracting from the complete and absolute discretion of the Engineer to insist upon such tolerances as establishing reasonably close conformity, the Engineer may accept variances beyond such tolerances as reasonably close conformity where they will not materially affect the value or utility of the Work and the interests of the Department." (Court's Exhibit A-1.)

the contract has been completed and such work is determined to conform to the contract specifications.

{¶ 12} Defendant maintains that the discovery of stripped nuts and a broken bolt suggests that the bolt assemblies had been over-tightened. In addition, YBI's failure to conform to the contract specifications constitutes a sufficient basis to reject the work and require YBI either to replace the bolt assemblies or to submit an engineer's report assuring ODOT that the bolt assemblies will not fail.

{¶ 13} Plaintiff argues that bolts may become loose for any number of reasons requiring them to be turned further than the match mark specified, and that such further tightening did not alter the integrity of the bolt assembly. In addition, plaintiff contends that over-tightening is not cause for rejection as there is no maximum tension established by the contract specifications. Plaintiff insists that ODOT was not entitled to reject the work inasmuch as: 1) there is no way to measure whether the bolts have been over-tightened unless the bolt actually breaks; 2) YBI performed its work in the same manner and custom as it had on other bridge replacement projects; and 3) the work was completed in a competent manner.

{¶ 14} "The purpose of contract construction is to realize and give effect to the intent of the parties. *Skivolocki v. East Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 313 N.E.2d 374, paragraph one of the syllabus. '[T]he intent of the parties to a contract resides in the language they chose to employ in the agreement.' *Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St.3d 635, 638, 1992-Ohio-28, 597 N.E.2d 499, citing *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 Ohio B. 289, 509 N.E.2d 411, paragraph one of the syllabus." *Stanley Miller Constr. Co. v. Ohio Sch. Facilities Comm'n*, Franklin App. Nos. 10AP-298,10AP-299,10AP-432,10AP-433, 2010-Ohio-6397, ¶10. However, simple words in a written instrument are to be given their plain and ordinary meaning unless to do so would create an absurd result. *Alexander v. Buckeye Pipeline* (1978), 53 Ohio St.2d 241. "If a court is able to determine the intent

of the parties from the plain language of the contract, then the court must apply the language as written and refrain from further contract interpretation. *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, ¶18, 875 N.E.2d 561; *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, ¶9, 801 N.E.2d 452." *Cleveland Constr., Inc. v. Kent State Univ.*, Franklin App. No. 09AP-822, 2010-Ohio-2906, ¶29.

{¶ 15} The court finds that plaintiff's reliance on YBI's work having met the usual custom and industry standards is misplaced in that the CSM authorizes compliance with reasonable manufacturing standards only when there are no specifications contained in the contract. However, in this instance, the contract provided bolt assembly specifications.

{¶ 16} For this project, ODOT required that the bolt assemblies be placed in accordance with the contract specifications; plaintiff admits that some number of bolt assemblies were not in conformance with the contract; ODOT expressed safety concerns after some assemblies were found to be damaged and requested either replacement of the assemblies or a report from a professional engineer that the assemblies were suitable for use in light of the foregoing issues. YBI chose to replace the bolt assemblies rather than to delay the project while attempting to obtain an engineering report. Thus, ODOT was well within its rights to demand conformity to the specifications or to seek an assurance that YBI's failure to comply with the specifications would not render the bridge unsafe for its intended purpose.

{¶ 17} Courts may not rewrite the contract or "decide cases of contractual interpretation on the basis of what is just or equitable. *N. Buckeye Educ. Council Group Health Benefits Plan v. Lawson*, 103 Ohio St.3d 188, 2004-Ohio-4886." Id. at ¶31. Indeed, a contract "does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto." *Dugan & Meyers Constr. Co. v. Ohio Dept. of Adm. Servs.*, 113 Ohio St.3d 226, 2007-Ohio-1687, ¶29.

For the foregoing reasons, judgment is recommended in favor of defendant.

*A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
LEE HOGAN
Magistrate

cc:

Joseph B. Jerome
55 Public Square, Suite 2020
Cleveland, Ohio 44113-1901

Kristin S. Boggs
William C. Becker
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

SJM/cmd
Filed February 11, 2011
To S.C. reporter March 22, 2011