[Cite as *Dynamics Research Corp. v. Ohio Dept. of Job & Family Servs.*, 2014-Ohio-516.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Dynamics Research Corporation, | : | |
| Plaintiff-Appellant/ [Cross-Appellee], | : | |
| | : | No. 13AP-22 |
| v. | | (Ct. of Cl. No. 2010-06231) |
| | : | |
| Ohio Department of Job and Family Services et al., | : | (REGULAR CALENDAR) |
| | : | |
| Defendants-Appellees/ [Cross-Appellants]. | : | |
| | : | |

D E C I S I O N

Rendered on February 13, 2014

*Bricker & Eckler LLP*, *James J. Hughes, III* and *Jennifer A. Flint*, for appellant.

*Michael DeWine*, Attorney General, *Randall W. Knutti* and *Amy S. Brown*, for appellees.

APPEAL from the Court of Claims of Ohio

KLATT, J.

{¶ 1} Plaintiff-appellant, Dynamics Research Corporation ("DRC"), appeals a judgment of the Court of Claims of Ohio. Defendants-appellees, the Ohio Department of Job and Family Services ("ODJFS") and the Ohio Department of Administrative Services, cross appeal. For the following reasons, we reverse and remand.

{¶ 2} The federal government provides states funding to plan, design, develop, and implement a Statewide Automated Child Welfare Information System ("SACWIS").

42 U.S.C. 674(a)(3)(C).  To qualify for the funding, a state must achieve approval of an advanced planning document ("APD").  The APD "must provide for a design which, when implemented, will produce a comprehensive system, which is effective and efficient, to improve the program management and administration of the plans for titles IV-B [child welfare services] and IV-E [foster care and adoption assistance] as provided under [45 C.F.R. 1355.53]."  45 C.F.R. 1355.53(a).  The Administration for Children and Families, part of the Department of Health and Human Services, assesses whether a state's SACWIS complies with the APD and federal requirements.  45 C.F.R. 1355.55.  Failure to comply may result in the recoupment of federal funds.  45 C.F.R. 1355.56(b)(4).

{¶ 3}  The state of Ohio contracted with DRC to develop and implement a SACWIS.  The contract required DRC to perform 12 tasks in order to complete the project.  Each task included the production of specified deliverables.

{¶ 4}  Task 3, entitled "System Analysis and Design," required DRC "to perform a detailed analysis of the system requirements and develop the detailed specifications required to construct and implement the new Ohio SACWIS."  Plaintiff's exhibit No. 1, at 34.  To complete this task, DRC first had to thoroughly review and confirm with ODJFS staff the system requirements contained in the 48-page "Supplement 2" to the Request for Proposals.  As stated in the contract:

> [T]he Contractor must work with State staff to fully understand the scope, purpose, and implications of each requirement.  Requirement confirmation will require reviews with representatives from system user categories and selected local county child welfare offices to validate both central (State level) and local (county level) requirements.  Requirements specified in Supplement 2 were developed by the standing Business Partner's Committee.  This committee is comprised of county and state policy staff to discuss the functional aspects and requirements of Ohio's system.  It is planned that this committee will continue to clarify and verify system requirements for Ohio SACWIS.  * * * The key areas that must be explicitly addressed by the Contractor in the requirements analysis include at a minimum:
>
> - System functionality for the Ohio SACWIS which includes all mandatory federal functionality requirements and State required functionality[.]
>
> * * *

> The results of this requirements refinement must be thoroughly documented and must be presented as the Ohio SACWIS Vision Document.

Plaintiff's exhibit No. 1, at 35.

{¶ 5} Task 3 also called for DRC to develop specifications for system requirements based on the Vision Document. DRC would then use the system requirements specifications to prepare the functional specifications for Ohio's SACWIS. Finally, based on the approved functional specifications, DRC would produce design specifications.

{¶ 6} The remaining tasks required DRC to develop Ohio's SACWIS application, convert data in the current child welfare systems to make it available on Ohio's SACWIS, perform system testing, conduct a pilot implementation of Ohio's SACWIS in a single county, train state and county staff, implement Ohio's SACWIS statewide, provide documentation necessary for federal review and approval of Ohio's SACWIS, and supply on-site technical support and maintenance after the statewide implementation.

{¶ 7} The last task required under the contract was Task 12, entitled "Mandatory Post Implementation Support." Toward the end of the project, the state and DRC amended the contractual terms governing Task 12. Although originally scheduled to last one year, the parties shortened the post-implementation support period to a little over nine months. The parties also agreed that the post-implementation period—and, thus, the contract—would terminate on April 10, 2009. During the post-implementation period, DRC staff would "work on enhancements and defects at the state's direction." Plaintiff's exhibit No. 2, at 153.

{¶ 8} The contract between Ohio and DRC was for a fixed price, portions of which were payable when DRC reached specified "milestones." DRC attained each milestone by completing work associated with the milestone. The amount of payment due at each milestone was a percentage of the total contract price that bore no relation to the cost of the work performed to complete the work tied to the milestone. The state structured the milestone payment schedule so that payment was backloaded, which meant that the state deferred paying a large portion the contract price until the end stages of the contract period. Also, the state designated ten percent of the contract price as a holdback, which would be paid upon completion of Task 12.

{¶ 9} DRC's right to payment was "contingent on the complete and satisfactory performance of * * * all relevant parts of the Project tied to the applicable milestone." Plaintiff's exhibit No. 1, at 76. DRC achieved such performance by submitting for the state's review all the deliverables associated with a particular task. If the state accepted a deliverable, it would issue a letter of acceptance to DRC. Upon receipt of acceptance letters for all the deliverables associated with a task, DRC was permitted to submit an invoice for the milestone payment tied to that task.

{¶ 10} DRC started working on the SACWIS project in May 2004. Over the next four and one-half years, DRC submitted to the state all deliverables associated with Task 1 through 10. The state accepted all of those deliverables. As permitted by the contract, DRC delivered to the state invoices for work performed to complete tasks one through ten. The state paid those invoices.

{¶ 11} On January 28, 2009, the state informed DRC that it was terminating the contract effective February 27, 2009. The state terminated the contract pursuant to the provision of the contract that permitted the state to "terminate * * * for its convenience and without cause." Plaintiff's exhibit No. 1, at 81.

{¶ 12} The contract specified how compensation to DRC would be determined if the state terminated for convenience. According to the contract:

> If the termination is for the convenience of the State, the Contractor will be entitled to compensation for any work on the Project that the Contractor has performed before the termination. Such compensation will be the Contractor's exclusive remedy in the case of termination for convenience and will be available to the Contractor only once the Contractor has submitted a proper invoice for such, with the invoice reflecting the amount determined to be owing to the Contractor by the State. The State will make that determination based on the lesser of the percentage of the Project completed or the hours of work performed in relation to the estimated total hours required to perform the entire applicable unit(s) of Work.

Plaintiff's exhibit No. 1, at 82. Therefore, upon termination for convenience, the amount of compensation due to DRC would be the contract price multiplied by the lesser of "the percentage of the Project completed" or the percentage calculated by determining "the

hours of work performed in relation to the estimated hours required to perform the entire applicable unit(s) of Work."

{¶ 13} The contract required DRC to prepare and deliver to the state a termination report upon receipt of the notice of termination. That report had to "detail the work completed at the date of termination [and] the percentage of the Project's completion." Plaintiff's exhibit No. 1, at 81.

{¶ 14} In its termination report, DRC stated that it had completed and delivered to the state all contract deliverables. Additionally, DRC informed the state that it had completed all tasks, except for Task 12, which required DRC to provide post-implementation support. Before the termination for convenience, the project was to terminate on April 10, 2009. As reported by DRC, "[t]he remaining effort that was to have been performed under Task 12 during the period February 28, 2009 through April 10, 2009 consist[ed] of level-of-effort support of 11 staff personnel (2,774 hours) available to the State to perform state-identified, post-implementation Task 12 work activities." Plaintiff's exhibit No. 19, at 5.

{¶ 15} In conformance with the parties' contract, the termination report also included calculations of the percentage of the project's completion. DRC determined the "percentage of Project completed" by subtracting the hours of unperformed work (2,774 hours) from the number of hours that DRC had estimated that it would require to complete the entire project (585,841 hours). DRC then divided the result (583,067 hours) by the number of estimated hours to complete the project (585,841 hours) to conclude that it had completed 99.5 percent of the project. In other words, (585,841 hours − 2,774 hours) / 585,841 hours = 99.5 percentage of project complete.[1]

{¶ 16} Next, DRC calculated "the hours of work performed in relation to the estimated total hours required to perform the entire applicable unit(s) of Work." DRC had actually expended 643,205 hours in performing the contract. Thus, the actual hours expended exceeded the estimated hours needed for performance (585,841 hours). Due to DRC's underestimation, the computation of actual hours in relation to estimated hours

---

[1] If this result is rounded to two numbers after the decimal point, instead of one, the result is 99.53 percent.

yielded the result that DRC completed 109.7 percent of the project. Under this computation, the state would owe more money than the contract price.

{¶ 17} Ultimately, DRC invoiced the state for $1,122,404.46. DRC computed this amount by multiplying the fixed price of the contract ($52,602,471) by 99.53 percent, the "percentage of the Project completed" as calculated in the termination report. The result was $52,355,239.39. Since the state had already paid DRC $51,232,834.93, DRC requested payment in the amount of $1,122,404.46 ($52,355,239.39 - $51,232,834.93 = $1,122,404.46).

{¶ 18} The state rejected DRC's calculations and invoice. The state first concluded that DRC was not entitled to the milestone payments tied to the completion of post-implementation support for March 2009 ($525,000) and April 2009 ($476,047.95). Due to the termination for convenience, DRC did not provide post-implementation support in March or April 2009. The state, therefore, reasoned that it could withhold the two milestone payments, totaling $1,001,047.95, due at the completion of the March and April work.

{¶ 19} Second, the state considered the portion of the holdback payment still within the state's possession, which totaled $368,587.41. In the last amendment to the contract, the parties had agreed to two final holdback payment milestones based on post-implementation work: (1) the provision of support during months one through four of the post-implementation period, at the conclusion of which the state would pay DRC $568,587.42, and (2) the provision of support during months five through ten of the post-implementation period, at the conclusion of which the state would pay DRC $368,587.41. The state paid DRC $568,587.42 upon the completion of the work tied to the first holdback payment milestone. The termination for convenience prevented DRC from completing the work tied to the second holdback payment milestone. Although DRC provided post-implementation support during months five through eight, it could not perform during months nine and ten. The state thus concluded that DRC had only performed 75 percent of the work associated with the final holdback payment milestone.[2]

---

[2] The state never explained how it mathematically arrived at this percentage. We are at a loss to explain the state's computation, as four months (the amount of the period during which DRC performed) divided by six months (the total duration of the period) equals 66.67 percent of the period, not 75 percent of the period.

Therefore, the state only paid DRC 75 percent of the holdback payment, or $276,440.56 ($368,587.41 x 75 percent = $276,440.56).

{¶ 20} DRC rejected the $276,440.56 payment as full and final payment of the contract price. On April 19, 2010, DRC filed suit against defendants, alleging claims for breach of contract and unjust enrichment. Defendants answered and asserted a counterclaim, which included claims for breach of contract and unjust enrichment. Defendants alleged that DRC breached the contract by not providing the state with a SACWIS that complied with all mandatory federal functionality requirements.

{¶ 21} After a trial on liability issues only, the trial court rendered judgment in DRC's favor on its breach of contract claim and against the state on its claims. Subsequently, the trial court awarded DRC $282,595.22 in damages, prejudgment interest, and the cost of the filing fee. The trial court arrived at this amount by following the state's reasoning as set forth in the state's response to DRC's final invoice. The trial court disallowed recovery of the March and April 2009 milestone payments because DRC did not work during March or April 2009. The trial court awarded DRC only 66.67 percent of the final holdback payment because DRC only worked 66.67 percent of the six months of work that had to be completed to attain that payment. Thus, the trial court calculated DRC's damages at $245,724.94. The trial court then determined that prejudgment interest amounted to $36,845.28.

{¶ 22} Both DRC and defendants appeal from the trial court's final judgment. DRC assigns the following error:

> The trial court erred by ignoring the clear and unambiguous terms of the Contract and calculating DRC's compensation upon termination for convenience based on the payment milestone schedule instead of the percentage of work completed methodology identified in the Contract as the "exclusive remedy" that applies upon termination for convenience.

{¶ 23} On cross-appeal, defendants assign two errors:

> 1. The trial court misinterpreted the meaning of the term "percentage of the Project [c]ompleted."

> 2. The trial court erred by awarding Dynamics prejudgment interest and costs.

{¶ 24} DRC's assignment of error and defendants' first assignment of error challenge how the trial court determined the amount of compensation due to DRC. Because these assignments of error are interrelated, we will address them together.

{¶ 25} In its liability decision, the trial court found that the amount due to DRC turned on the "percentage of the Project completed." Despite this finding, the trial court calculated the amount due by considering whether DRC completed the work tied to the unpaid milestone payments. This was error because it ignored the plain language of the contract.

{¶ 26} Contract interpretation is a matter of law, and courts of appeal review questions of law under the de novo standard. *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, ¶ 38. When construing the terms of a contract, a court's principal objective is to determine the intent of the parties. *Hodesh v. Korelitz*, 123 Ohio St.3d 72, 2009-Ohio-4220, ¶ 10. The parties' intent usually resides in the language the parties chose to use in the contract. *Huff v. FirstEnergy Corp.*, 130 Ohio St.3d 196, 2011-Ohio-5083, ¶ 12. When that language is clear, courts look no further than the contract to find the intent of the parties. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 11. On the other hand, when that language is ambiguous, courts may consider extrinsic evidence to ascertain the parties' intent. *Id.* at ¶ 12.

{¶ 27} Here, the contract included a milestone payment schedule that set forth when and how much the state would pay DRC. Under that payment structure, DRC received a set portion of the contract price when DRC completely and satisfactorily performed the work tied to a milestone payment and invoiced the state. However, the payment structure changed once the state terminated the contract for convenience. Upon termination, DRC became "entitled to compensation for any work on the Project that [DRC] ha[d] performed before the termination." Plaintiff's exhibit No. 1, at 82. This compensation was DRC's "exclusive remedy." *Id.*

{¶ 28} The milestone payment structure did not compensate DRC for work as that work was performed; instead, it dispersed a percentage of payment at set intervals once DRC accomplished certain performance goals. Since the milestone payment structure was backloaded, DRC performed work long before it received compensation for that work. Consequently, once DRC became "entitled to compensation for any work on the Project,"

a different method for calculating damages was required. In place of the milestone payment structure, the contract mandated payment of compensation "based on the lesser of the percentage of the Project completed or the hours of work performed in relation to the estimated total hours required to perform the entire applicable unit(s) of Work." Plaintiff's exhibit No. 1, at 82.

{¶ 29} Here, the parties agree that the "percentage of the Project completed" renders a lesser amount of compensation than the calculation of "hours of work performed in relation to estimated total hours." The latter calculation results in a compensation amount that exceeds the contract price because DRC expended more hours than it anticipated in performing the contract. Thus, however it is determined, the "percentage of the Project completed" multiplied by the contract price results in the appropriate amount of compensation.

{¶ 30} The conflict at the core of this case is how the "percentage of the Project completed" should be measured. The parties each advocate for different computation methods. The state asserts the trial court should have determined the "percentage of the Project completed" by looking at the value of the work completed prior to DRC's termination. Under the state's preferred calculation, the "percentage of the Project completed" would equal the value of the work completed divided by the contract price. DRC contends that the trial court should have computed the "percentage of the Project completed" using the method DRC set forth in the termination report. Under that method, DRC subtracted the number of hours scheduled to be worked, but not yet worked, from the total estimated number of hours for the project, and divided the result by the total estimated number of hours.

{¶ 31} The trial court did not employ either of the two proposed methods to calculate the "percentage of the Project completed," nor did it set forth its own method. Rather, the trial court reverted to the milestone payment structure to determine the amount of compensation due to DRC. The plain language of the contract, however, precluded the trial court from doing so. Once the state terminated the contract for convenience, achievement of the milestones no longer controlled whether DRC received payment. Nevertheless, the trial court calculated DRC's compensation by looking to whether and to what extent DRC had completed work tied to the remaining milestones.

The trial court did not interpret the meaning of "percentage of the Project completed," nor did it attempt to calculate damages using that measurement of computing payment due. Therefore, the trial court erred in calculating the amount of DRC's compensation.

{¶ 32} Defendants argue that this error is not prejudicial because DRC did not present sufficient evidence concerning the "percentage of the Project completed." Defendants maintain that DRC left more work undone than it has acknowledged, so DRC's calculations do not truly capture the "percentage of the Project completed." According to defendants, the incomplete work includes the failure to correct defects and add enhancements to Ohio's SACWIS so that the SACWIS achieves approval from the federal government.

{¶ 33} Defendants' argument is unpersuasive for two reasons. First, defendants' problem is not that DRC did not perform work, but that DRC did not perform work properly. If DRC did not perform satisfactorily under the contract, defendants had recourse: they could notify DRC of the default and give DRC the opportunity to cure. If DRC did not timely cure the default, then defendants could terminate the contract for cause. Upon such a termination, defendants could recover the cost of cover, i.e., the amount the state paid to another contractor to complete the project. Defendants did not pursue this remedy. In fact, DRC did not learn that defendants considered its work defective until after it filed suit.

{¶ 34} Different parts of the contract govern the amounts due after termination for cause and termination for convenience. Defendants had the opportunity to terminate for cause and pursue damages for default, but they instead terminated for convenience. Upon termination for convenience, DRC became "entitled to compensation for *any* work on the Project that [DRC] ha[d] performed before the termination." (Emphasis added.) Plaintiff's exhibit No. 1, at 82. Despite this contractual language, defendants now want to avoid compensating DRC for work that it performed but defendants claim is defective. Essentially, defendants are trying to repurpose a contract provision intended to calculate the amount of work performed into a provision that recompenses them for damages due to an alleged default. Based on the contract language, we find defendants cannot recover for a default through the calculation of the "percentage of the Project completed."

{¶ 35} Second, the trial court found that defendants failed to present compelling evidence that DRC did not perform the work at issue. Defendants claim that DRC did not fulfill its contractual obligation to deliver a SACWIS system that complied with "all mandatory federal functionality requirements." Plaintiff's exhibit No. 1, at 35. DRC, however, did not owe such an obligation to defendants.

{¶ 36} As required by Task 3, DRC engaged in a collaborative process with ODJFS to identify system requirements for Ohio's SACWIS. Based upon the information received during this process, DRC created an "Ohio SACWIS Vision Document," which, per the contract, addressed "[s]ystem functionality for the Ohio SACWIS which includes *all mandatory federal functionality requirements*." (Emphasis added.) Plaintiff's Exhibit No. 1, at 35. DRC delivered this document to the state, and the state accepted and approved it. DRC then used this document to design Ohio's SACWIS. Each requirement in the document was "traced to the design to make sure that the system design met those requirements." (Tr. 390.) The state accepted and approved the system's design.

{¶ 37} In June 2007 and May 2009, the Administration for Children and Families ("ACF") conducted site visits to view Ohio's SACWIS. After each of these visits, ACF generated reports identifying areas of potential noncompliance with federal requirements. However, noncompliance does not necessarily equate to a defect or require additional work from DRC to meet the contract terms. As Kathleen Baird, DRC's vice president and general manager of state programs, testified:

> [I]f the State told us to build something through the approved design a certain way, that's what we had to do. And if that turns out not to meet with what the federal analyst is looking for, we would not consider that to be defect, we would consider that to be a change. If the State is able to take [areas of noncompliance identified by ACF] and go back to that requirements traceability matrix and say, [for example,] ah-ha, there's a requirement right here for you to take data back in from county financial systems and you didn't do it, that would have been a defect. But it would have had to have gone back to the requirements traceability matrix that was part of our contract.

(Tr. 405-06.)

{¶ 38} In other words, DRC had an obligation to build Ohio's SACWIS in accordance with the contract,[3] and the contract called for a system that met state-approved functionality and design specifications, not federal requirements. Defendants have not pointed to any state-approved functionality or design specification that DRC failed to include in Ohio's SACWIS. Defendants have also not asserted that DRC did not sufficiently address the federal requirements in creating the list of system requirements for Ohio's SACWIS.[4] Defendants, therefore, have no basis for claiming that AFC's concerns about the functionality of Ohio's SACWIS means that DRC's work is incomplete.

{¶ 39} In sum, we agree with the trial court that defendants have not shown that DRC failed to complete more than just the post-implementation support period. We thus reject defendants' argument that DRC's calculation of the "percentage of the Project completed" does not account for all unperformed work. Consequently, the trial court's failure to compute DRC's compensation pursuant to the "percentage of the Project completed" constitutes error prejudicial to DRC.

{¶ 40} Having found that the trial court prejudicially erred in its use of the milestone payment structure to calculate DRC's compensation, we sustain DRC's assignment of error. To decide defendants' first cross-assignment of error, we must conduct further analysis. Defendants argue the trial court erred in not adopting the valuation method of computing the "percentage of the Project completed" because that computation method is the sole method allowed under the contract. We disagree.

{¶ 41} "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, at ¶ 11. Consequently, when a court cannot determine a contract term's meaning from the four corners of the contract, that term is ambiguous. *Cent. Funding, Inc. v. CompuServe Interactive Servs., Inc.*, 10th Dist. No. 02AP-972, 2003-Ohio-5037, ¶ 42.

---

[3] This is consistent with the contract, which states, "The State is purchasing a SACWIS system that performs according to the Contract requirements." Plaintiff's exhibit No. 1, at 27.

[4] Lack of required functionality in Ohio's SACWIS may result, at least partially, from the breath of the federal requirements. For example, ACF may interpret a requirement that a SACWIS provide "more efficient, economical and effective administration" of child welfare programs to require a specific functionality that neither DRC nor the state anticipated was necessary. 45 C.F.R. 1335.52(a)(4).

{¶ 42} Here, the parties' contract does not set forth any method for calculating the "percentage of the Project completed."  The contract, therefore, contains an ambiguity regarding what method the parties should use.

{¶ 43} Defendants contend that the context in which the phrase "percentage of the Project completed" appears elucidates its meaning.  Upon a termination for convenience, the contract requires the computation of DRC's compensation "based on the lesser of the percentage of the Project completed or the hours of work performed in relation to the estimated total hours required to perform the entire applicable unit(s) of Work." Plaintiff's exhibit No. 1, at 82.  According to defendants, the latter calculation is intended to measure the cost DRC incurred in performing its work and compensate DRC for that cost.  Thus, defendants reason, the former calculation must be intended to measure the value of DRC's work and compensation DRC for that value.

{¶ 44} We believe that defendants read too much into the contractual language. The contract contemplates two different calculations that would result in two different amounts of compensation.  Thus, the "percentage of the Project completed" cannot be determined using "the hours of work performed in relation to the estimated total hours required to perform the entire applicable unit(s) of Work."  Beyond that, however, we find no limitation on the meaning of "percentage of the Project completed."  Nothing in the contractual language restricts the calculation of the "percentage of the Project completed" to the value method defendants champion.  Consequently, we find no error in the trial court's failure to use defendants' method to calculate the "percentage of the Project completed."  We thus overrule defendants' first cross-assignment of error.

{¶ 45} Given our ruling on DRC's assignment of error, we must reverse the damages award and remand for a recalculation of damages.  Therefore, defendants' second cross-assignment of error is moot.

{¶ 46} For the foregoing reasons, we sustain DRC's assignment of error, overrule defendants' first cross-assignment of error, and find defendants' second cross-assignment of error moot.    We reverse the judgment of the Court of Claims of Ohio

and remand this case to that court for further proceedings consistent with law and this decision.

*Judgment reversed; cause remanded.*

SALDER, P.J., and McCORMAC, J., concur.

McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Ohio Constitution, Article IV, Section 6(C).

———————————